## PRIMA PAINT CORP. *v.* FLOOD & CONKLIN MFG. CO.

No. 343.   Argued March 16, 1967.—Decided June 12, 1967.

*Robert P. Herzog* argued the cause and filed briefs for petitioner.

*Martin A. Coleman* argued the cause for respondent. With him on the brief was *David N. Brainin.*

*Gerald Aksen* argued the cause for the American Arbitration Association, as *amicus curiae.* With him on the brief were *Whitney North Seymour, Sol N. Corbin, Osmond K. Fraenkel, William J. Isaacson* and *H. H. Nordlinger.*

MR. JUSTICE FORTAS delivered the opinion of the Court.

This case presents the question whether the federal court or an arbitrator is to resolve a claim of "fraud in

the inducement," under a contract governed by the United States Arbitration Act of 1925,[1] where there is no evidence that the contracting parties intended to withhold that issue from arbitration.

The question arises from the following set of facts. On October 7, 1964, respondent, Flood & Conklin Manufacturing Company, a New Jersey corporation, entered into what was styled a "Consulting Agreement," with petitioner, Prima Paint Corporation, a Maryland corporation. This agreement followed by less than three weeks the execution of a contract pursuant to which Prima Paint purchased F & C's paint business. The consulting agreement provided that for a six-year period F & C was to furnish advice and consultation "in connection with the formulae, manufacturing operations, sales and servicing of Prima Trade Sales accounts." These services were to be performed personally by F & C's chairman, Jerome K. Jelin, "except in the event of his death or disability." F & C bound itself for the duration of the contractual period to make no "Trade Sales" of paint or paint products in its existing sales territory or to current customers. To the consulting agreement were appended lists of F & C customers, whose patronage was to be taken over by Prima Paint. In return for these lists, the covenant not to compete, and the services of Mr. Jelin, Prima Paint agreed to pay F & C certain percentages of its receipts from the listed customers and from all others, such payments not to exceed $225,000 over the life of the agreement. The agreement took into account the possibility that Prima Paint might encounter financial difficulties, including bankruptcy, but no corresponding reference was made to possible financial problems which might be encountered by F & C. The agreement stated that it "embodies the entire understanding of the parties

---

[1] 9 U. S. C. §§ 1–14.

on the subject matter." Finally, the parties agreed to a broad arbitration clause, which read in part:

"Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in the City of New York, in accordance with the rules then obtaining of the American Arbitration Association . . . ."

The first payment by Prima Paint to F & C under the consulting agreement was due on September 1, 1965. None was made on that date. Seventeen days later, Prima Paint did pay the appropriate amount, but into escrow. It notified attorneys for F & C that in various enumerated respects their client had broken both the consulting agreement and the earlier purchase agreement. Prima Paint's principal contention, so far as presently relevant, was that F & C had fraudulently represented that it was solvent and able to perform its contractual obligations, whereas it was in fact insolvent and intended to file a petition under Chapter XI of the Bankruptcy Act, 52 Stat. 905, 11 U. S. C. § 701 *et seq.*, shortly after execution of the consulting agreement. Prima Paint noted that such a petition was filed by F & C on October 14, 1964, one week after the contract had been signed. F & C's response, on October 25, was to serve a "notice of intention to arbitrate." On November 12, three days before expiration of its time to answer this "notice," Prima Paint filed suit in the United States District Court for the Southern District of New York, seeking rescission of the consulting agreement on the basis of the alleged fraudulent inducement.[2] The complaint asserted that the federal court had diversity jurisdiction.

---

[2] Although the letter to F & C's attorneys had alleged breaches of both consulting and purchasing agreements, and the fraudulent inducement of both, the complaint did not refer to the earlier purchase agreement, alleging only that Prima Paint had been "fraudulently

Contemporaneously with the filing of its complaint, Prima Paint petitioned the District Court for an order enjoining F & C from proceeding with the arbitration. F & C cross-moved to stay the court action pending arbitration. F & C contended that the issue presented— whether there was fraud in the inducement of the consulting agreement—was a question for the arbitrators and not for the District Court. Cross-affidavits were filed on the merits. On behalf of Prima Paint, the charges in the complaint were reiterated. Affiants for F & C attacked the sufficiency of Prima Paint's allegations of fraud, denied that misrepresentations had been made during negotiations, and asserted that Prima Paint had relied exclusively upon delivery of the lists, the promise not to compete, and the availability of Mr. Jelin. They contended that Prima Paint had availed itself of these considerations for nearly a year without claiming "fraud," noting that Prima Paint was in no position to claim ignorance of the bankruptcy proceeding since it had participated therein in February of 1965. They added that F & C was revested with its assets in March of 1965.

The District Court granted F & C's motion to stay the action pending arbitration, holding that a charge of fraud in the inducement of a contract containing an arbitration clause as broad as this one was a question for the arbitrators and not for the court. For this proposition it relied on *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.,* 271 F. 2d 402 (C. A. 2d Cir. 1959), cert. granted, 362 U. S. 909, dismissed under Rule 60, 364 U. S. 801 (1960). The Court of Appeals for the Second Circuit dismissed Prima Paint's appeal. It held that the contract in question evidenced a transaction involving interstate commerce; that under the controlling *Robert*

induced to accelerate the execution and closing date of the [consulting] agreement herein, from October 21, 1964 to October 7, 1964. . . ."

*Lawrence Co.* decision a claim of fraud in the inducement of the contract generally—as opposed to the arbitration clause itself—is for the arbitrators and not for the courts; and that this rule—one of "national substantive law"—governs even in the face of a contrary state rule.[3]  We agree, albeit for somewhat different reasons, and we affirm the decision below.

The key statutory provisions are §§ 2, 3, and 4 of the United States Arbitration Act of 1925.  Section 2 provides that a written provision for arbitration "in any maritime transaction or a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." [4]  Section 3 requires a federal court in which suit has been brought "upon any issue referable to arbitration under an agreement in writing for such arbitration" to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement.  Section 4 provides a federal remedy for a party "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration," and directs the federal court to order arbitration once it is satisfied that an agreement for arbitration has been made and has not been honored.[5]

---

[3] Whether a party seeking *rescission* of a contract on the ground of fraudulent inducement may in New York obtain judicial resolution of his claim is not entirely clear.  Compare *Exercycle Corp.* v. *Maratta,* 9 N. Y. 2d 329, 334, 174 N. E. 2d 463, 465 (1961), and *Amerotron Corp.* v. *Maxwell Shapiro Woolen Co.,* 3 App. Div. 2d 899, 162 N. Y. S. 2d 214 (1957), aff'd, 4 N. Y. 2d 722, 148 N. E. 2d 319 (1958), with *Fabrex Corp.* v. *Winard Sales Co.,* 23 Misc. 2d 26, 200 N. Y. S. 2d 278 (1960).  In light of our disposition of this case, we need not decide the status of the issue under New York law.

[4] The meaning of "maritime transaction" and "commerce" is set forth in § 1 of the Act.

[5] See, *infra,* at 403–404.

In *Bernhardt* v. *Polygraphic Co.*, 350 U. S. 198 (1956), this Court held that the stay provisions of § 3, invoked here by respondent F & C, apply only to the two kinds of contracts specified in §§ 1 and 2 of the Act, namely those in admiralty or evidencing transactions in "commerce." Our first question, then, is whether the consulting agreement between F & C and Prima Paint is such a contract. We agree with the Court of Appeals that it is. Prima Paint acquired a New Jersey paint business serving at least 175 wholesale clients in a number of States, and secured F & C's assistance in arranging the transfer of manufacturing and selling operations from New Jersey to Maryland.[6] The consulting agreement was inextricably tied to this interstate transfer and to the continuing operations of an interstate manufacturing and wholesaling business. There could not be a clearer case of a contract evidencing a transaction in interstate commerce.[7]

---

[6] This conclusion is amply supported by an affidavit submitted to the District Court by Prima Paint's own president, which read in part:

"The agreement entered into between the parties on October 7, 1964, contemplated and intended an orderly transfer of the assets of the defendant to the plaintiff, and further contemplated and intended that the defendant would consult, advise, assist and help the plaintiff so as to insure a smooth transition of manufacturing operations to Maryland from New Jersey, together with the sales and servicing of customer accounts and the retention of the said customers."

The affidavit's references to a "transfer of the assets" cannot fairly be read to mean only "expertise and know-how . . . and a covenant not to compete," as argued by counsel for petitioner.

[7] It is suggested in dissent that, despite the absence of any language in the statute so indicating, we should construe it to apply only to "contracts between merchants for the interstate shipment of goods." Not only have we neither the desire nor the warrant so to amend the statute, but we find persuasive and authoritative evidence of a contrary legislative intent. See, *e. g.*, the House Report on this legislation which proclaims that "[t]he control over interstate commerce [one of the bases for the legislation] reaches not only the

Having determined that the contract in question is within the coverage of the Arbitration Act, we turn to the central issue in this case: whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators. The courts of appeals have differed in their approach to this question. The view of the Court of Appeals for the Second Circuit, as expressed in this case and in others,[8] is that—*except where the parties otherwise intend*—arbitration clauses as a matter of federal law are "separable" from the contracts in which they are embedded, and that where no claim is made that fraud was directed to the arbitration clause itself, a broad arbitration clause will be held to encompass arbitration of the claim that the contract itself was induced by fraud.[9] The Court of Appeals for the First

---

actual physical interstate shipment of goods but also contracts relating to interstate commerce." H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924). We note, too, that were the dissent's curious narrowing of the statute correct, there would have been no necessity for Congress to have amended the statute to exclude certain kinds of employment contracts. See § 1. In any event, the anomaly urged upon us in dissent is manifested by the present case. It would be remarkable to say that a contract for the purchase of a single can of paint may evidence a transaction in interstate commerce, but that an agreement relating to the facilitation of the purchase of an entire interstate paint business and its re-establishment and operation in another State is not.

[8] In addition to *Robert Lawrence Co., supra,* see *In re Kinoshita & Co.,* 287 F. 2d 951 (C. A. 2d Cir. 1961). With respect to claims other than fraud in the inducement, the court has followed a similar process of analysis. See, *e. g., Metro Industrial Painting Corp.* v. *Terminal Constr. Co.,* 287 F. 2d 382 (C. A. 2d Cir. 1961) (dispute over performance); *El Hoss Engineer. & Transport Co.* v. *American Ind. Oil Co.,* 289 F. 2d 346 (C. A. 2d Cir. 1961) (where, however, the court found an intent not to submit the issue in question to arbitration).

[9] The Court of Appeals has been careful to honor evidence that the parties intended to withhold such issues from the arbitrators

Circuit, on the other hand, has taken the view that the question of "severability" is one of state law, and that where a State regards such a clause as inseparable a claim of fraud in the inducement must be decided by the court. *Lummus Co.* v. *Commonwealth Oil Ref. Co.*, 280 F. 2d 915, 923–924 (C. A. 1st Cir.), cert. denied, 364 U. S. 911 (1960).[10]

With respect to cases brought in federal court involving maritime contracts or those evidencing transactions in "commerce," we think that Congress has provided an explicit answer. That answer is to be found in § 4 of the Act, which provides a remedy to a party seeking to compel compliance with an arbitration agreement. Under §4, with respect to a matter within the jurisdiction of the federal courts save for the existence of an arbitration clause, the federal court is instructed to order arbitration to proceed once it is satisfied that "the making of the agreement for arbitration or the failure to comply [with the arbitration agreement] is not in issue." [11] Accordingly, if the claim is fraud in the inducement of the arbitration clause itself—an issue which

---

and to reserve them for judicial resolution. See *El Hoss Engineer. & Transport Co.* v. *American Ind. Oil Co., supra.* We note that categories of contracts otherwise within the Arbitration Act but in which one of the parties characteristically has little bargaining power are expressly excluded from the reach of the Act. See § 1.

[10] These cases and others are discussed in a recent Note, Commercial Arbitration in Federal Courts, 20 Vand. L. Rev. 607, 622–625 (1967).

[11] Section 4 reads in part: "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement. . . . If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."

goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it.[12] But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally. Section 4 does not expressly relate to situations like the present in which a stay is sought of a federal action in order that arbitration may proceed. But it is inconceivable that Congress intended the rule to differ depending upon which party to the arbitration agreement first invokes the assistance of a federal court. We hold, therefore, that in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate. In so concluding, we not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.

There remains the question whether such a rule is constitutionally permissible. The point is made that, whatever the nature of the contract involved here, this case is in federal court solely by reason of diversity of citizenship, and that since the decision in *Erie R. Co.* v. *Tompkins,* 304 U. S. 64 (1938), federal courts are bound in diversity cases to follow state rules of decision in matters which are "substantive" rather than "proce-

---

[12] This position is consistent both with the decision in *Moseley* v. *Electronic Facilities,* 374 U. S. 167, 171, 172 (1963), and with the statutory scheme. As the "saving clause" in § 2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so. To immunize an arbitration agreement from judicial challenge on the ground of fraud in the inducement would be to elevate it over other forms of contract—a situation inconsistent with the "saving clause."

dural," or where the matter is "outcome determinative." *Guaranty Trust Co.* v. *York,* 326 U. S. 99 (1945). The question in this case, however, is not whether Congress may fashion federal substantive rules to govern questions arising in simple diversity cases. See *Bernhardt* v. *Polygraphic Co., supra,* at 202, and concurring opinion, at 208. Rather, the question is whether Congress may prescribe how federal courts are to conduct themselves with respect to subject matter over which Congress plainly has power to legislate. The answer to that can only be in the affirmative. And it is clear beyond dispute that the federal arbitration statute is based upon and confined to the incontestable federal foundations of "control over interstate commerce and over admiralty." H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924); S. Rep. No. 536, 68th Cong., 1st Sess., 3 (1924).[13]

---

[13] It is true that the Arbitration Act was passed 13 years before this Court's decision in *Erie R. Co.* v. *Tompkins, supra,* brought to an end the regime of *Swift* v. *Tyson,* 16 Pet. 1 (1842), and that at the time of enactment Congress had reason to believe that it still had power to create federal rules to govern questions of "general law" arising in simple diversity cases—at least, absent any state statute to the contrary. If Congress relied at all on this "oft-challenged" power, see *Erie R. Co.,* 304 U. S., at 69, it was only supplementary to the admiralty and commerce powers, which formed the principal bases of the legislation. Indeed, Congressman Graham, the bill's sponsor in the House, told his colleagues that it "only affects contracts relating to interstate subjects and contracts in admiralty." 65 Cong. Rec. 1931 (1924). The Senate Report on this legislation similarly indicated that the bill "[relates] to maritime transactions and to contracts in interstate and foreign commerce." S. Rep. No. 536, 68th Cong., 1st Sess., 3 (1924).

Non-congressional sponsors of the legislation agreed. As Mr. Charles L. Bernheimer, chairman of the Arbitration Committee of the New York Chamber of Commerce, told the Senate subcommittee, the proposed legislation "follows the lines of the New York arbitration law, applying it to the fields wherein there is Federal jurisdiction.

In the present case no claim has been advanced by Prima Paint that F & C fraudulently induced it to enter into the agreement to arbitrate "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof." This contractual language is easily broad enough to encompass Prima Paint's claim that both execution and acceleration of the consulting agreement itself were procured by fraud. Indeed, no claim is made that Prima Paint ever intended that "legal" issues relating to the contract be excluded from arbitration, or that it was not entirely free so to contract. Federal courts are bound to apply rules enacted by Congress with respect to matters—here, a contract involving commerce—over which it has legislative power. The question which Prima Paint requested the District Court to adjudicate preliminarily to allowing arbitration to proceed is one

---

These fields are in admiralty and in foreign and interstate commerce." Hearing on S. 4213 and S. 4214, before the Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 2 (1923). In the joint House and Senate hearings, Mr. Bernheimer answered "Yes; entirely," to the statement of the chairman, Senator Sterling, that "What you have in mind is that this proposed legislation relates to contracts arising in interstate commerce." Joint Hearings on S. 1005 and H. R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 7 (1924). Mr. Julius Henry Cohen, draftsman for the American Bar Association of the proposed bill, said the sponsor's goals were: "[F]irst . . . to get a State statute, *and then to get a Federal law to cover interstate and foreign commerce and admiralty,* and, third, to get a treaty with foreign countries." Joint Hearings, *supra,* at 16 (emphasis added). See also Joint Hearings, *supra,* at 27–28 (statement of Mr. Alexander Rose). Mr. Cohen did submit a brief to the Subcommittee urging a jurisdictional base broader than the commerce and admiralty powers, Joint Hearings, *supra,* at 37–38, but there is no indication in the statute or in the legislative history that this invitation to go beyond those powers was accepted, and his own testimony took a much narrower tack.

not intended by Congress to delay the granting of a § 3 stay. Accordingly, the decision below dismissing Prima Paint's appeal is

*Affirmed.*

MR. JUSTICE HARLAN: In joining the Court's opinion I desire to note that I would also affirm the judgment below on the basis of *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.,* 271 F. 2d 402 (C. A. 2d Cir. 1959), cert. granted, 362 U. S. 909, dismissed under Rule 60, 364 U. S. 801 (1960).

MR. JUSTICE BLACK, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE STEWART join, dissenting.

The Court here holds that the United States Arbitration Act, 9 U. S. C. §§ 1–14, as a matter of federal substantive law, compels a party to a contract containing a written arbitration provision to carry out his "arbitration agreement" even though a court might, after a fair trial, hold the entire contract—including the arbitration agreement—void because of fraud in the inducement. The Court holds, what is to me fantastic, that the legal issue of a contract's voidness because of fraud is to be decided by persons designated to arbitrate factual controversies arising out of a valid contract between the parties. And the arbitrators who the Court holds are to adjudicate the legal validity of the contract need not even be lawyers, and in all probability will be nonlawyers, wholly unqualified to decide legal issues, and even if qualified to apply the law, not bound to do so. I am by no means sure that thus forcing a person to forgo his opportunity to try his legal issues in the courts where, unlike the situation in arbitration, he may have a jury trial and right to appeal, is not a denial of due process of law. I am satisfied, however, that Congress did not impose any such procedures in the Arbitration Act. And I am fully satisfied that a

reasonable and fair reading of that Act's language and history shows that both Congress and the framers of the Act were at great pains to emphasize that nonlawyers designated to adjust and arbitrate factual controversies arising out of valid contracts would not trespass upon the courts' prerogative to decide the legal question of whether any legal contract exists upon which to base an arbitration.

## I.

The agreement involved here is a consulting agreement in which Flood & Conklin agreed to perform certain services for and not to compete with Prima Paint. The agreement contained an arbitration clause providing that "[a]ny controversy or claim arising out of or relating to this Agreement . . . shall be settled by arbitration in the City of New York." F & C, contending that Prima had failed to make a payment under the contract, sent Prima a "Notice of Intention to Arbitrate" pursuant to the New York Arbitration Act.[1] Invoking diversity jurisdiction, Prima brought this action in federal district court to rescind the entire consulting agreement on the ground of fraud. The fraud allegedly consisted of F & C's misrepresentation at the time the contract was made, that it was solvent and able to perform the agreement, while in fact it was completely insolvent. Prima alleged that it would not have made any contract at all with F & C but for this misrepresentation. Prima simply contended that there was never a meeting of minds between the parties. F & C moved to stay Prima's lawsuit for rescission pending arbitration of the fraud issue raised by Prima. The lower courts, relying on the

---

[1] N. Y. Civ. Prac. § 7503 (1963) provides that once a party is served with a notice of intention to arbitrate, "unless the party served applies to stay the arbitration within ten days after such service he shall thereafter be precluded from objecting that a valid agreement was not made . . . ."

Second Circuit's decision in *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc.,* 271 F. 2d 402, cert. granted, 362 U. S. 909, dismissed, 364 U. S. 801, held that, as a matter of "national substantive law," the arbitration clause in the contract is "separable" from the rest of the contract and that allegations that go to the validity of the contract in general, as opposed to the arbitration clause in particular, are to be decided by the arbitrator, not the court.

The Court today affirms this holding for three reasons, none of which is supported by the language or history of the Arbitration Act. First, the Court holds that because the consulting agreement was intended to supplement a separate contract for the interstate transfer of assets, it is itself a "contract evidencing a transaction involving commerce," the language used by Congress to describe contracts the Act was designed to cover. But in light of the legislative history which indicates that the Act was to have a limited application to contracts between merchants for the interstate shipment of goods,[2] and in light of the express failure of Congress to use language

---

[2] The principal support for the Act came from trade associations dealing in groceries and other perishables and from commercial and mercantile groups in the major trading centers. 50 A. B. A. Rep. 357 (1925). Practically all who testified in support of the bill before the Senate subcommittee in 1923 explained that the bill was designed to cover contracts between people in different States who produced, shipped, bought, or sold commodities. Hearing on S. 4213 and S. 4214 before the Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 3, 7, 9, 10 (1923). The same views were expressed in the 1924 hearings. When Senator Sterling suggested, "What you have in mind is that this proposed legislation relates to contracts arising in interstate commerce," Mr. Bernheimer, a chief exponent of the bill, replied: "Yes; entirely. The farmer who will sell his carload of potatoes, from Wyoming, to a dealer in the State of New Jersey, for instance." Joint Hearings on S. 1005 and H. R. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 7. See also *id.*, at 27.

making the Act applicable to all contracts which "affect commerce," the statutory language Congress normally uses when it wishes to exercise its full powers over commerce,[3] I am not at all certain that the Act was intended to apply to this consulting agreement. Second, the Court holds that the language of § 4 of the Act provides an "explicit answer" to the question of whether the arbitration clause is "separable" from the rest of the contract in which it is contained. Section 4 merely provides that the court must order arbitration if it is "satisfied that the making of the agreement for arbitration . . . is not in issue." That language, considered alone, far from providing an "explicit answer," merely poses the further question of what kind of allegations put the making of the arbitration agreement in issue. Since both the lower courts assumed that but for the federal Act, New York law might apply and that under New York law a general allegation of fraud in the inducement puts into issue the making of the agreement to arbitrate (considered insep-

---

[3] In some Acts Congress uses broad language and defines commerce to include even that which "affects" commerce. Federal Employers' Liability Act, 35 Stat. 65, § 1, as amended, 45 U. S. C. § 51; National Labor Relations Act, 49 Stat. 450, § 2, as amended, 29 U. S. C. § 152 (7). In other instances Congress has chosen more restrictive language. Fair Labor Standards Act of 1938, 52 Stat. 1062, § 6, as amended, 29 U. S. C. § 206. Prior to this case, this Court has always made careful inquiry to assure itself that it is applying a statute with the coverage that Congress intended, so that the meaning *in that statute* of "commerce" will be neither expanded nor contracted. The Arbitration Act is an example of carefully limited language. It covers only those contracts "involving commerce," and nowhere is there a suggestion that it is meant to extend to contracts "affecting commerce." The Act not only uses narrow language, but also is completely without any declaration of some national interest to be served or some nationwide comprehensive scheme of regulation to be created, and this absence suggests that Congress did not intend to exert its full power over commerce.

arable under New York law from the rest of the contract),[4] the Court necessarily holds that federal law determines whether certain allegations put the making of the arbitration agreement in issue. And the Court approves the Second Circuit's fashioning of a federal separability rule which overrides state law to the contrary. The Court thus holds that the Arbitration Act, designed to provide merely a procedural remedy which would not interfere with state substantive law, authorizes federal courts to fashion a federal rule to make arbitration clauses "separable" and valid. And the Court approves a rule which is not only contrary to state law, but contrary to the intention of the parties and to accepted principles of contract law—a rule which indeed elevates arbitration provisions above all other contractual provisions. As the Court recognizes, that result was clearly not intended by Congress. Finally, the Court summarily disposes of the problem raised by *Erie R. Co.* v. *Tompkins,* 304 U. S. 64, recognized as a serious constitutional problem in *Bernhardt* v. *Polygraphic Co.,* 350 U. S. 198, by insufficiently supported assertions that it is "clear beyond dispute" that Congress based the Arbitration Act on its power to regulate commerce and that "[i]f Congress relied at all on" its power to create federal law for diversity cases, such reliance "was only supplementary."

---

[4] Although F & C requested arbitration pursuant to New York law, n. 1, *supra,* it is not entirely clear that New York law would apply in absence of the federal Act. And, as the Court points out, it is not entirely clear whether New York courts would consider Prima's promise to arbitrate inseparable from the rest of the contract. But, since *Robert Lawrence* held and the lower courts here assumed that application of New York law would produce a different result, and since the Court deems the status of state law immaterial to this case, I have assumed throughout this opinion that, in the absence of the Arbitration Act, Prima would have been able to obtain *judicial* resolution of its fraud allegations under New York law.

## II.

Let us look briefly at the language of the Arbitration Act itself as Congress passed it. Section 2, the key provision of the Act, provides that "[a] written provision in . . . a contract . . . involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract.*" (Emphasis added.) Section 3 provides that "[i]f any suit . . . be brought . . . *upon any issue referable to arbitration* under an agreement in writing for such arbitration, the court . . . *upon being satisfied that the issue involved in such suit . . . is referable to arbitration under such an agreement,* shall . . . stay the trial of the action until such arbitration has been had . . . ."[5] (Emphasis added.) The language of these sections could not, I think, raise doubts about their meaning except to someone anxious to find doubts. They simply mean this: an arbitration agreement is to be enforced by a federal court unless the court, not the arbitrator, finds grounds "at law or in equity for the revocation of any contract." Fraud, of course, is one of the most common grounds for revoking a contract. If the contract was procured by fraud, then, unless the defrauded party elects to affirm it, there is absolutely no contract, nothing to be arbitrated. Sections 2 and 3 of the Act assume the existence of a valid contract. They merely provide for enforcement where such a valid contract

---

[5] This section, unlike § 4, is expressly applicable to situations like the present one where a defendant in a case already pending in federal court moves for a stay of the lawsuit. In finding an "explicit answer" in a provision "not expressly" applicable, the Court almost completely ignores the language of § 3 and the proviso to § 2, a section which *Bernhardt* held to "define the field in which Congress was legislating." 350 U. S., at 201.

exists. These provisions were plainly designed to protect a person against whom arbitration is sought to be enforced from having to submit his legal issues as to validity of the contract to the arbitrator. The legislative history of the Act makes this clear. Senator Walsh of Montana, in hearings on the bill in 1923, observed, "The court has got to hear and determine whether there is an agreement of arbitration, undoubtedly, and it is open to all defenses, equitable and legal, that would have existed at law . . . ." [6] Mr. Piatt, who represented the American Bar Association which drafted and supported the Act, was even more explicit: "I think this will operate something like an injunction process, except where he would attack it on the ground of fraud." [7] And then Senator Walsh replied: "If he should attack it on the ground of fraud, *to rescind the whole thing. . . .* I presume that it merely [is] a question of whether he did make the arbitration agreement or not, . . . and then he would possibly set up that he was misled about the contract and entered into it by mistake . . . ." [8] It is evident that Senator Walsh was referring to situations in which the validity of the entire contract is called into question. And Mr. Bernheimer, who represented one of the chambers of commerce in favor of the bill, assured the Senate subcommittee that "[t]he constitutional right to jury trial is adequately safeguarded" by the Act.[9] Mr. Cohen, the American Bar Association's draftsman of the bill, assured the members of Congress that the Act would not impair the right to a jury trial, because it deprives a person of that right only when he has voluntarily and validly waived it by agreeing to submit cer-

---

[6] Senate Hearing, *supra,* at 5.

[7] *Ibid.*

[8] *Ibid.*

[9] Senate Hearing, *supra,* at 2.

tain disputes to arbitration.[10]  The court and a jury are to determine both the legal existence and scope of such an agreement.  The members of Congress revealed an acute awareness of this problem.  On several occasions they expressed opposition to a law which would enforce even a valid arbitration provision contained in a contract between parties of unequal bargaining power.  Senator Walsh cited insurance, employment, construction, and shipping contracts as routinely containing arbitration clauses and being offered on a take-it-or-leave-it basis to captive customers or employees.[11]  He noted that such contracts "are really not voluntarily [*sic*] things at all" because "there is nothing for the man to do except to sign it; and then he surrenders his right to have his case tried by the court . . . ."[12]  He was emphatically assured by the supporters of the bill that it was not their intention to cover such cases.  The significant thing is that Senator Walsh was not thinking in terms of the arbitration provisions being "separable" parts of such contracts, parts which should be enforced without regard to why the entire contracts in which they were contained were agreed to.  The issue for him was not whether an arbitration provision in a contract was made, but why, in the context of the entire contract and the circum-

---

[10] "The one constitutional provision we have got is that you have a right of trial by jury.  But you can waive that.  And you can do that in advance.  Ah, but the question whether you waive it or not depends on whether that is your signature to the paper, or whether you authorized that signature, or whether the paper is a valid paper or not, whether it was delivered properly.  So there is a question there which you have not waived the right of trial by jury on."  Joint Hearings, *supra*, at 17.

It seems quite clear to me that Mr. Cohen was referring to a jury trial of allegations challenging the validity of the *entire* contract.

[11] Senate Hearing, *supra*, at 9–11.  See also Joint Hearings, *supra*, at 15.

[12] Senate Hearing, *supra*, at 9.

stances of the parties, the entire contract was made. That is precisely the issue that a general allegation of fraud in the inducement raises: Prima contended that it would not have executed any contract, including the arbitration clause, if it were not for the fraudulent representations of F & C. Prima's agreement to an arbitration clause in a contract obtained by fraud was no more "voluntary" than an insured's or employee's agreement to an arbitration clause in a contract obtained by superior bargaining power.

Finally, it is clear to me from the bill's sponsors' understanding of the function of arbitration that they never intended that the issue of fraud in the inducement be resolved by arbitration. They recognized two special values of arbitration: (1) the expertise of an arbitrator to decide factual questions in regard to the day-to-day performance of contractual obligations,[13] and (2) the speed with which arbitration, as contrasted to litigation, could resolve disputes over performance of contracts and thus mitigate the damages and allow the parties to continue performance under the contracts.[14] Arbitration serves neither of these functions where a contract is sought to be rescinded on the ground of fraud. On the one hand, courts have far more expertise in resolving legal issues which go to the validity of a contract than

---

[13] "Not all questions arising out of contracts ought to be arbitrated. It is a remedy peculiarly suited to the disposition of the ordinary disputes between merchants as to questions of fact—quantity, quality, time of delivery, compliance with terms of payment, excuses for non-performance, and the like. It has a place also in the determination of the simpler questions of law—the questions of law which arise out of these daily relations between merchants as to the passage of title, the existence of warranties, or the questions of law which are complementary to the questions of fact which we have just mentioned." Cohen & Dayton, The New Federal Arbitration Law, 12 Va. L. Rev. 265, 281 (1926).

[14] See, *e. g.*, Senate Hearing, *supra*, at 3.

do arbitrators.[15]   On the other hand, where a party seeks to rescind a contract and his allegation of fraud in the inducement is true, an arbitrator's speedy remedy of this wrong should never result in resumption of performance under the contract.   And if the contract were not procured by fraud, the court, under the summary trial procedures provided by the Act, may determine with little delay that arbitration must proceed.   The only advantage of submitting the issue of fraud to arbitration is for the arbitrators.   Their compensation corresponds to the volume of arbitration they perform.   If they determine that a contract is void because of fraud, there is nothing further for them to arbitrate.   I think it raises serious questions of due process to submit to an arbitrator an issue which will determine his compensation.   *Tumey* v. *Ohio,* 273 U. S. 510.

### III.

With such statutory language and legislative history, one can well wonder what is the basis for the Court's surprising departure from the Act's clear statement which expressly excepts from arbitration "such grounds as exist at law or in equity for the revocation of any contract." Credit for the creation of a rationalization to justify this statutory mutilation apparently must go to the Second Circuit's opinion in *Robert Lawrence Co.* v. *Devonshire Fabrics, Inc., supra.*   In that decision Judge Medina undertook to resolve the serious constitutional problem which this Court had avoided in *Bernhardt* by holding the Act inapplicable to a diversity case involving an intrastate contract.   That problem was whether the Arbitra-

---

[15] "It [arbitration] is not a proper remedy for . . . questions with which the arbitrators have no particular experience and which are better left to the determination of skilled judges with a background of legal experience and established systems of law."   Cohen & Dayton, *supra,* at 281.

tion Act, passed 13 years prior to *Erie R. Co.* v. *Tompkins,*
304 U. S. 64, could be constitutionally applied in a diver-
sity case even though its application would require the
federal court to enforce an agreement to arbitrate which
the state court across the street would not enforce.
*Bernhardt's* holding that arbitration is "outcome deter-
minative," 350 U. S., at 203, and its recognition that
there would be unconstitutional discrimination if an arbi-
tration agreement were enforceable in federal court but
not in the state court, *id.,* at 204, posed a choice of two
alternatives for Judge Medina.  If he held that the Arbi-
tration Act rested solely on Congress' power, widely
recognized in 1925 but negated in *Erie,* to prescribe gen-
eral federal law applicable in diversity cases, he would
be compelled to hold the Act unconstitutional as applied
to diversity cases under *Erie* and *Bernhardt.*[16]  If he
held that the Act rested on Congress' power to enact
substantive law governing interstate commerce, then the
*Erie-Bernhardt* problem would be avoided and the appli-
cation of the Act to diversity cases involving commerce
could be saved.

The difficulty in choosing between these two alterna-
tives was that neither, quite contrary to the Court's
position, was "clear beyond dispute" upon reference to
the Act's legislative history.[17]  As to the first, it is clear
that Congress intended the Act to be applicable in diver-
sity cases involving interstate commerce and maritime

---

[16] Mr. Justice Frankfurter chose this alternative in his concurring
opinion in *Bernhardt,* 350 U. S., at 208, and even the Court there
suggested that its pre-*Erie* decision in *Shanferoke Coal & Supply
Corp.* v. *Westchester Service Corp.,* 293 U. S. 449, which applied the
Act to an interstate contract in a diversity case, might be decided
differently under the *Bernhardt* holding that arbitration is outcome-
determinative, 350 U. S., at 202.

[17] For an analysis of these alternatives, see generally, Symposium,
Arbitration and the Courts, 58 Nw. U. L. Rev. 466 (1963); Note,
69 Yale L. J. 847 (1960).

contracts,[18] and to hold the Act inapplicable in diversity cases would be severely to limit its impact. As to the second alternative, it is clear that Congress in passing the Act relied primarily on its power to create general federal rules to govern federal courts. Over and over again the drafters of the Act assured Congress: "The statute establishes a procedure in the Federal courts . . . . It rests-upon the constitutional provision by which Congress is authorized to establish and control inferior Federal courts. So far as congressional acts relate to the procedure in the Federal courts, they are clearly within the congressional power." [19]  And again: "The primary purpose of the statute is to make enforcible in the Federal courts such agreements for arbitration, and for this purpose Congress rests solely upon its power to prescribe

---

[18] The House Report accompanying the Act expressly stated: "The purpose of this bill is to make valid and enforcible agreements for arbitration contained in contracts involving interstate commerce . . . *or which may be the subject of litigation in the Federal courts.*" H. R. Rep. No. 96, 68th Cong., 1st sess., 1 (1924) (emphasis added). Mr. Cohen and a colleague, commenting on the Act after its passage, explained: "The Federal courts are given jurisdiction to enforce such agreements whenever under the Judicial Code they would have had jurisdiction . . . . Where the basis of jurisdiction is diversity of citizenship, the dispute must involve $3000 as in suits at law." Cohen & Dayton, *supra,* at 267.  See, *e. g.,* Committee on Commerce, Trade & Commercial Law, The United States Arbitration Law and Its Application, 11 A. B. A. J. 153, 156; Note, 20 Ill. L. Rev. 111 (1925). The bill, as originally drafted by the American Bar Association, 49 A. B. A. Rep. 51–52 (1924), and introduced in the House, H. R. No. 646, 68th Cong., 1st Sess. (1924), 65 Cong. Rec. 11081–11082 (1924), expressly provided in § 8 "[t]hat if the basis of jurisdiction be diversity of citizenship . . . the district court . . . shall have jurisdiction . . . hereunder notwithstanding the amount in controversy is unascertained . . . ." Though that provision was deleted by the Senate, the omission was not intended substantially to alter the law. 66 Cong. Rec. 3004 (1925).

[19] Committee on Commerce, Trade & Commercial Law, *supra,* 11 A. B. A. J., at 154.

the jurisdiction and duties of the Federal courts." [20]   One cannot read the legislative history without concluding that this power, and not Congress' power to legislate in the area of commerce, was the "principal basis" of the Act.[21]   Also opposed to the view that Congress intended to create substantive law to govern commerce and maritime transactions are the frequent statements in the legislative history that the Act was not intended to be "the source of . . . substantive law." [22]   As Congressman Graham explained the Act to the House:

> "It does not involve any new principle of law except to provide a simple method . . . in order to give enforcement . . . . *It creates no new legislation, grants no new rights, except a remedy* to enforce an agreement in commercial contracts and in

---

[20] Joint Hearings, *supra,* at 38.

[21] Although Mr. Cohen, in a brief filed with Congress, suggested that Congress might rely on its power over commerce, he added that there were "questions which apparently can be raised in this connection," *id.,* at 38, and expressly denied that "the proposed law depends for its validity upon the exercise of the interstate-commerce and admiralty powers of Congress," *id.,* at 37.   And when he testified, he made the point clearer:

"So what we have done . . . [in New York] is that we have . . . made it a part of our judicial machinery.   That is what we have done.   But it can not be done under our constitutional form of government and cover the great fields of commerce until you gentlemen do it, in the exercise of your power to confer jurisdiction on the Federal courts.   The theory on which you do this is that you have the right to tell the Federal courts how to proceed." *Id.,* at 17.

The legislative history which the Court recites to support its assertion that Congress relied principally on its power over commerce consists mainly of statements that the Act was designed to cover only contracts in commerce, and that is certainly true.   But merely because the Act was designed to enforce arbitration agreements only in contracts in commerce, does not mean that Congress was primarily relying on its power over commerce in supplying that remedy of enforceability.

[22] Cohen & Dayton, *supra,* at 276.

admiralty contracts." 65 Cong. Rec. 1931 (1924).
(Emphasis added.)

Finally, there are clear indications in the legislative history that the Act was not intended to make arbitration agreements enforceable in state courts[23] or to provide an independent federal-question basis for jurisdiction in federal courts apart from diversity jurisdiction.[24] The absence of both of these effects—which normally follow from legislation of federal substantive law—seems to militate against the view that Congress was creating a body of federal substantive law.

Suffice it to say that Judge Medina chose the alternative of construing the Act to create federal substantive law in order to avoid its emasculation under *Erie* and *Bernhardt*. But Judge Medina was not content to stop there with a holding that the Act makes arbitration agreements in a contract involving commerce enforceable in federal court even though the basis of jurisdiction is diversity and state law does not enforce such

---

[23] See, *e. g.*, Cohen & Dayton, *supra*, at 277; Committee on Commerce, Trade & Commercial Law, *supra*, at 155, 156. Mr. Rose, representing the Arbitration Society of America, suggested that the Act might have the beneficial effect of encouraging States to enact similar laws, Joint Hearings, *supra*, at 28, but Mr. Cohen assured Congress:

"Nor can it be said that the Congress of the United States, directing its own courts . . . , would infringe upon the provinces or prerogatives of the States. . . . [T]he question of the enforcement relates to the law of remedies and not to substantive law. The rule must be changed for the jurisdiction in which the agreement is sought to be enforced . . . . There is no disposition therefore by means of the Federal bludgeon to force an individual State into an unwilling submission to arbitration enforcement." *Id.*, at 39–40.

[24] This seems implicit in § 3's provision for a stay by a "court in which such suit is pending" and § 4's provision that enforcement may be ordered by "any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties."

agreements. The problem in *Robert Lawrence,* as here, was not whether an arbitration agreement is enforceable, for the New York Arbitration Act, upon which the federal Act was based, enforces an arbitration clause in the same terms as the federal Act. The problem in *Robert Lawrence,* and here, was rather whether the arbitration clause in a contract induced by fraud is "separable." Under New York law, it was not: general allegations of fraud in the inducement would, as a matter of state law, put in issue the making of the arbitration clause. So to avoid this application of state law, Judge Medina went further than holding that the federal Act makes agreements to arbitrate enforceable: he held that the Act creates a "body of law" that "encompasses questions of interpretation and construction as well as questions of validity, revocability and enforceability of arbitration agreements affecting interstate commerce or maritime affairs." 271 F. 2d, at 409.

Thus, 35 years after the passage of the Arbitration Act, the Second Circuit completely rewrote it. Under its new formulation, § 2 now makes arbitration agreements enforceable "save upon such grounds as exist at *federal* law for the revocation of any contract." And under § 4, before enforcing an arbitration agreement, the district court must be satisfied that "the making of the agreement for arbitration, *as a matter of federal law,* is not in issue." And then when Judge Medina turned to the task of "the formulation of the principles of federal substantive law necessary for this purpose," 271 F. 2d, at 409, he formulated the separability rule which the Court today adopts—not because § 4 provided this rule as an "explicit answer," not because he looked to the intention of the parties, but because of his notion that the separability rule would further a "liberal policy of promoting arbitration." 271 F. 2d, at 410.[25]

---

[25] It should be noted that the New York courts apparently do not find any inconsistency between application of a nonseparability rule

Today, without expressly saying so, the Court does precisely what Judge Medina did in *Robert Lawrence*. It is not content to hold that the Act does all it was intended to do: make arbitration agreements enforceable in federal courts if they are valid and legally existent under state law. The Court holds that the Act gives federal courts the right to fashion federal law, inconsistent with state law, to determine whether an arbitration agreement was made and what it means. Even if Congress intended to create substantive rights by passage of the Act, I am wholly convinced that it did not intend to create such a sweeping body of federal substantive law completely to take away from the States their power to interpret contracts made by their own citizens in their own territory.

*First*. The legislative history is clear that Congress intended no such thing. Congress assumed that arbitration agreements were recognized as valid by state and federal law.[26] Courts would give damages for their breach, but would simply refuse to specifically enforce them. Congress thus had one limited purpose in mind: to provide a party to such an agreement "a remedy formerly denied him." [27] "Arbitration under the Federal . . . [statute] is simply a new procedural remedy." [28] The Act "creates no new legislation, grants no new rights, except a remedy to enforce . . . ." [29] The drafters of the Act were very explicit:

"A Federal statute providing for the enforcement of arbitration agreements does relate solely to pro-

---

and that State's policy of enforcing arbitration agreements, a policy embodied in a statute from which the federal Act was copied.

[26] S. Rep. No. 536, 68th Cong., 1st Sess., 2 (1924); Joint Hearings, *supra*, at 38.

[27] Cohen & Dayton, *supra*, at 271.

[28] *Id.*, at 279.

[29] 65 Cong. Rec. 1931 (1924).

cedure of the Federal courts. *It is no infringement upon the right of each State to decide for itself what contracts shall or shall not exist under its laws.* To be sure *whether or not a contract exists is a question of the substantive law of the jurisdiction wherein the contract was made.*" Committee on Commerce, Trade & Commercial Law, The United States Arbitration Law and Its Application, 11 A. B. A. J. 153, 154. (Emphasis added.)

"Neither is it true that such a statute, declaring arbitration agreements to be valid, is the source of their existence as a matter of substantive law. . . .

"So far as the present law declares simply the policy of recognizing and enforcing arbitration agreements in the Federal courts it does not encroach upon the province of the individual States." Cohen & Dayton, The New Federal Arbitration Law, 12 Va. L. Rev. 265, 276–277.

All this indicates that the § 4 inquiry of whether the making of the arbitration agreement is in issue is to be determined by reference to state law, not federal law formulated by judges for the purpose of promoting arbitration.

*Second.* The avowed purpose of the Act was to place arbitration agreements "upon the same footing as other contracts." [30] The separability rule which the Court applies to an arbitration clause does not result in equality between it and other clauses in the contract. I had always thought that a person who attacks a contract on the ground of fraud and seeks to rescind it has to seek rescission of the whole, not tidbits, and is not given the option of denying the existence of some clauses and affirming the existence of others. Here F & C agreed both to perform consulting services for Prima and not to

---

[30] H. R. Rep. No. 96, 68th Cong., 1st Sess. (1924).

compete with Prima. Would any court hold that those two agreements were separable, even though Prima in agreeing to pay F & C not to compete did not directly rely on F & C's representations of being solvent? The simple fact is that Prima would not have agreed to the covenant not to compete or to the arbitration clause but for F & C's fraudulent promise that it would be financially able to perform consulting services. As this Court held in *United States* v. *Bethlehem Steel Corp.*, 315 U. S. 289, 298:

> "Whether a number of promises constitute one contract [and are non-separable] or more than one is to be determined by inquiring 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever, if any promise or set of promises were struck out.' "

Under this test, all of Prima's promises were part of one, inseparable contract.

*Third.* It is clear that had this identical contract dispute been litigated in New York courts under its arbitration act, Prima would not be required to present its claims of fraud to the arbitrator if the state rule of nonseparability applies. The Court here does not hold today, as did Judge Medina,[31] that the body of federal substantive law created by federal judges under the Arbitration Act is required to be applied by state courts. A holding to that effect—which the Court seems to leave up in the air—would flout the intention of the framers of the Act.[32] Yet under this Court's opinion today— that the Act supplies not only the remedy of enforcement but a body of federal doctrines to determine the validity of an arbitration agreement—failure to make the Act

---

[31] "This is a declaration of national law equally applicable in state or federal courts." 271 F. 2d, at 407.

[32] See n. 23, *supra*.

applicable in state courts would give rise to "forum shopping" and an unconstitutional discrimination that both *Erie* and *Bernhardt* were designed to eliminate. These problems are greatly reduced if the Act is limited, as it should be, to its proper scope: the mere enforcement in federal courts of valid arbitration agreements.

## IV.

The Court's summary treatment of these issues has made it necessary for me to express my views at length. The plain purpose of the Act as written by Congress was this and no more: Congress wanted federal courts to enforce contracts to arbitrate and plainly said so in the Act. But Congress also plainly said that whether a contract containing an arbitration clause can be rescinded on the ground of fraud is to be decided by the courts and not by the arbitrators. Prima here challenged in the courts the validity of its alleged contract with F & C as a whole, not in fragments. If there has never been any valid contract, then there is not now and never has been anything to arbitrate. If Prima's allegations are true, the sum total of what the Court does here is to force Prima to arbitrate a contract which is void and unenforceable before arbitrators who are given the power to make final legal determinations of their own jurisdiction, not even subject to effective review by the highest court in the land. That is not what Congress said Prima must do. It seems to be what the Court thinks would promote the policy of arbitration. I am completely unable to agree to this new version of the Arbitration Act, a version which its own creator in *Robert Lawrence* practically admitted was judicial legislation. Congress might possibly have enacted such a version into law had it been able to foresee subsequent legal events, but I do not think this Court should do so.

I would reverse this case.