**REINSURANCE COMPANY OF AMERICA, Plaintiff,**

v.

**AMERICAN CENTENNIAL INSURANCE COMPANY and Transco Insurance Services, Defendants.**

No. 84 C 8658.

United States District Court, N.D. Illinois, E.D.

Nov. 6, 1985.

Edward F. Ruberry, Connelly, Ruberry & Mustes, and Richard Seligman, Schiff, Hardin & Waite, Chicago, Ill., for plaintiff.

Nicholas H. Diacou, Epton, Mullin & Druth, and Donald Egan, Katten, Muchin, Zavis, Pearl & Galler, Chicago, Ill., for defendants.

**MEMORANDUM AND ORDER**

MORAN, District Judge.

Reinsurance Company of America (RCA) and American Centennial Insurance Company (American Centennial) are, at least on

paper, parties to two contracts of reinsurance known as "facultative certificates." One insures certain risks for the State of Alaska (RPC Policy No. 21003), and the other covers a private manufacturing company, PACCAR, Inc. (RPC Policy No. 21002). Transco Insurance Services (Transco) acted as plaintiff's underwriter for these contracts. The underlying suit deals with the validity of the contracts. Each contract contains an arbitration clause. Based on the clause and Sections 2, 3 and 4 of the United States Arbitration Act (the Act), 9 U.S.C. § 1 *et seq.*, American Centennial has moved to stay the federal action and compel arbitration. The limited issue to be decided at this point is whether the parties entered into a binding agreement for purposes of the Act.

## I.

In October 1978, RCA and Transco orally agreed to have Transco act as RCA's agent. The parties seem to have argued over the extent of the agency relationship for almost a year after the contract was made. RCA was very concerned that Transco not underwrite risks without prior approval from the RCA offices, as evidenced by the following comments in letters from RCA's president of Transco's president:

> ... you [Transco] have no binding authority to use RCA as an issuing source and therefore your statement "Transco Insurance Services are currently underwriting managers for [RCA] ..." is without basis of fact as far as RCA is concerned.

(July 30, 1979), and

> With the agreement that you will not use RCA's name, in any way indicating that you have its pen or have managing general agency status, our primary concern is taken care of.

(October 15, 1979). On the other hand, RCA states in count 84(k) of its amended complaint that Transco acted as its "managing general agent," which in the business implies "authority coextensive with that of the principal." Appleman, *Insurance Law and Practice*, section 8693 at 257 (1981).

On September 11, 1978, Transco, acting as RCA's agent, issued the RCA facultative certificates RPC No. 21002 and RPC No. 21003 reinsuring 100 per cent of American Centennial's liability on its policies covering PACCAR, Inc. and Alaska, respectively. RPC No. 21002 was backdated to July 28, 1978 and RPC No. 21003 was backdated to July 1, 1978. Both policies extended one year. All the negotiations regarding the certificates were conducted between Transco and American Centennial.

RCA accepted premiums and paid losses on the certificates until November 1982, when it received a claim (the Frazier claim) on RPC No. 21002 for $1,000,000 (the certificate's limit).[1] While investigating this claim RCA learned that the claim was for a personal injury award arising out of an injury sustained by one of PACCAR's employees on August 1, 1978. RCA has refused to pay the Frazier claim, alleging that both the certificate which purports to cover this liability and RPC No. 21003 were fraudulently induced (count I of the amended complaint). However, RCA did pay a claim on RPC No. 21003 for $270,000 on December 29, 1982, and there is no evidence in the documents and affidavits filed thus far to indicate that outstanding obligations exist on RPC No. 21003.

On July 26, 1984, American Centennial served RCA with a demand to arbitrate disputes between them originating from the two facultative certificates. RCA refused to arbitrate and filed this action. Now, American Centennial seeks to stay this proceeding and force arbitration.

Both certificates contain the following clause:

> L. Any difference of opinion between the Reinsurer and the Company with respect to the interpretation of this certification or the performance of the obli-

---

1. There is no evidence in the record that any claims were made on PACCAR's policy until November 1982, but this information is not needed because no disputes arose until that date. The court will assume, therefore, that if any claims were made, they were paid by RCA.

gations under the certificate shall be submitted to arbitration.... The decision of the majority of arbitrators shall be final and binding on the parties.

American Centennial argues that this clause constitutes a written agreement to arbitrate governed by Section 4 of the Arbitration Act. This section states, in relevant part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court ... for an order directing that such arbitration proceed in the manner provided for in such agreement.... If the making of the arbitration agreement or the failure, neglect or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

Defendant argues that the actual making of the reinsurance contracts is not at issue because Transco had the real or apparent authority to bind plaintiff and because, even if such authority did not exist, plaintiff ratified the certificates by accepting premiums and paying claims on them. Plaintiff denies both that Transco had authority, apparent or actual, and that it ratified the certificates. It argues that because there was never a "meeting of the minds" between RCA and American Centennial the certificates are invalid contracts.

American Centennial first premised its motion to compel on the supposition that RCA's claim was that it was fraudulently induced to enter into contracts providing certain coverage, rather than a claim that it never agreed to arbitration. Accordingly, arbitration was mandated by the doctrine of *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Plaintiff rejoined by arguing, at least implicitly, that the doctrine is inapplicable because RCA never entered into any agreement with American Centennial, inasmuch as Transco lacked either apparent or actual authority to make any agreement binding upon RCA and, fur-

ther, RCA never ratified any such agreement.

The contention that Transco lacked apparent or actual authority to enter into an agreement providing 100 per cent reinsurance or backdated coverage or coverage of an already known claim is, however, a variation of a fraudulent inducement contention if, in fact, Transco had at least apparent authority to bind RCA upon a facultative certificate of one sort or another which contained an arbitration clause. Likewise, the contention that RCA never conclusively ratified an agreement covering the Frazier claim because that was a material and undisclosed fact which precluded knowing ratification is also a variation of a fraudulent inducement contention if, in fact, RCA accepted the benefits and obligations of a facultative certificate which it reasonably understood contained an arbitration clause. While the reach of *Prima Paint* is far from self-defining, as the Court of Appeals discussed in *Matterhorn, Inc. v. NCR Corporation*, 763 F.2d 866 (7th Cir.1985), we believe the doctrine of that case requires that the analysis focus upon whether or not RCA became legally bound to arbitrate and not whether it became legally bound upon the agreements as a whole. Based upon that analysis, this court concludes that it is beyond reasonable dispute that Transco had apparent authority to bind RCA to arbitrate any reinsurance dispute and that RCA ratified the agreements to arbitrate.

## II.

As the Seventh Circuit has noted:

The [Arbitration] Act was intended to make arbitration agreements specifically enforceable, upon the terms established by the parties. Accordingly, if the agreement provides for arbitration, the only issues open for the consideration of a federal court concern the "making of the agreement to arbitrate" itself.

*Dickinson v. Heinold Securities, Inc.*, 661 F.2d 638, 645 (7th Cir.1981) (citations omitted). The court is required to grant a hearing to determine if a valid contract exists if one party denies any agreement

was made and produces some evidence to substantiate the denial. *Interocean Shipping Company v. National Shipping and Trading Corp.*, 462 F.2d 673, 676 (2d Cir. 1972); *see also A/S Custodia v. Lessin International, Inc.*, 503 F.2d 318 (2d Cir. 1974) (issues to be decided were whether there was a meeting of the minds of the parties and the authority of the agents to bind their respective principals). The court in *Par-Knit Mills, Inc. v. Stockbridge Fabrics Company*, 636 F.2d 51 (3d Cir.1980), stated the standard for determining if a trial is needed:

> Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. If there is doubt as to whether such an agreement exists, the matter, upon a proper and timely demand, should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement. The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise.

636 F.2d at 54. At this stage the court must decide if there are disputed issues of material fact as to either Transco's apparent authority to issue or RCA's ratification of the certificates and, if there are not, which party should prevail as a matter of law.

The first issue to be decided is whether Transco had the apparent authority to bind RCA in a reinsurance contract providing for arbitration with American Centennial. In general, "authority of an agent may only come from the principal and it is therefore necessary to trace the source of an agent's authority to some word or act of the alleged principal." *Schoenberger v. Chicago Transit Authority*, 84 Ill.App.3d 1132, 1136, 39 Ill.Dec. 941, 405 N.E.2d 1076 (1st Dist.1980). When a party claims apparent authority it must show that the agent's words or acts would lead a reasonably prudent person to assume authority existed. *Schoenberger, supra; Old Security Life Insurance Co. v. Continental Illinois National Bank and Trust Co. of Chicago*, 740 F.2d 1384, 1391 (7th Cir.1984). These general principles of agency apply to insurance companies and their agents. Appleman, *Insurance Law and Practice*, section 8672 at 185 (1981); *see e.g., Jenco v. Jefferson Insurance Co. of New York*, 575 F.Supp. 980 (N.D.Ill.1983); *Miller v. Botts*, 77 Ill.App.2d 386, 222 N.E.2d 581 (2d Dist. 1966); *Aetna Life & Casualty Company v. Little*, 384 So.2d 213 (Fla.App.1980).

American Centennial claims that it reasonably believed Transco was RCA's general agent at the time of the contracts. Its strongest evidence is the contract forms themselves. RCA's name appears on the top left-hand side of the form, and on the top right-hand side is printed, "Transco Insurance Service, Underwriting Managers." [2] At the bottom of the form appears a line for a signature, underneath which is printed, "Authorized Representative."

The contract also states that "this certificate of reinsurance shall not be valid unless signed by a duly authorized representative of the insurer." Of the numerous copies of the contracts submitted as exhibits, only one is signed. The court assumes signed copies exist, however, because the plaintiff makes no mention of this otherwise blatant execution problem. "The forms furnished an agent for his use in transacting business with the public are cogent evidence as to what he is employed to do, and are representations to the public that he had authority to do things thereby indicated." Appleman, *Insurance Law and Practice*, section 8672 n. 13 at 207–208 (1981) and cases cited therein.

---

**2.** Defendant's expert, Henry T. Kramer, in his affidavit testified that the term "underwriting manager" is synonymous with "managing general agent" (Kramer affidavit, par. 5).

RCA disputes the validity of the forms. RCA claims that the forms Transco used were not authorized and, in fact, around the end of October 1978 RCA instructed Transco to "hold up issuing any further policies using these [the disputed] forms pending receipt of copies of our [RCA's] property and casualty forms." (Plaintiff's Exhibit E.)[3] However, there is no evidence that RCA required Transco to renegotiate any contracts using the new forms for the old, or in any way to communicate the limitations of Transco's authority to these insureds. RCA has not produced a copy of the new forms it sent to Transco (perhaps those contained arbitration clauses as well, as that appears to be the almost invariable practice), so the court has no way of knowing whether Transco's agency limitations were ever spelled out or whether, for that matter, there ever were any limitations upon the authority to provide for arbitration. Indeed, the exhibit upon which RCA relies indicates that RCA was aware that Transco had been using those forms, and there is nothing to suggest that RCA thereafter sought to determine what third parties, such as American Centennial, had relied upon them, and to disavow any arbitration obligations based upon their use. In this sense the ratification issue is intertwined with the apparent authority issue. RCA then had a relationship with Transco, although the nature of that relationship is in dispute, and it was aware that Transco had those forms for use. It did not investigate nor question the obligations arising from their use until years later.

■ Under Illinois law a third party dealing with an agent has a duty to verify the fact and extent of an agent's authority. *Malcak v. Westchester Park District,* 754 F.2d 239, 245 (7th Cir.1985), *Schoenberger, supra,* 39 Ill.Dec., at 946, 405 N.E.2d at 1081. However, the burden to investigate is not heavy, and the courts seem to find the duty satisfied if there were no factors or circumstances that would have put a reasonably prudent person on notice of the agent's lack of authority. This rule of agency conforms with insurance cases which hold that an insured is not bound by limitations imposed by the insurer on its agents if the insured had no notice thereof. *See* Appleman, *Insurance Law and Practice,* sections 8673 and 8674 (1981). Any other rule would severely impair insurance business, much of which is done through agents, and would place an undue burden on unsophisticated as well as sophisticated consumers of insurance. American Centennial had no reason to believe that RCA had not furnished Transco with these forms and that, therefore, RCA was naming Transco its "underwriting manager" or "general agent." American Centennial also had no notice of any limitations on Transco's authority. Without such notice American Centennial was entitled to rely on the form's language designating Transco as RCA's "underwriting manager" and providing for arbitration. Given this reliance, the court finds that, as a matter of law, Transco had the apparent authority to bind RCA to arbitrate disputes arising under facultative reinsurance certificates, RPC Nos. 21002 and 21003, and therefore that RCA entered into an agreement to arbitrate with American Centennial as a matter of law.

### III.

■ Further, "[r]atification occurs when the principal, with knowledge of an unauthorized transaction, takes a position inconsistent with the nonaffirmation of the transaction, or retains the benefits of the unauthorized transaction." *Old Security Life Insurance Co. v. Continental Illinois National Bank and Trust Co. of Chicago,* 740 F.2d 1384, 1392 (7th Cir.1984) (citations omitted); *Jenco v. Jefferson Insurance Co. of New York,* 575 F.Supp. 980, 984 (N.D.Ill.

---

3. Transco's president, Peter J. O'Shaughnessy, testified in his affidavit that "RCA approved the form of facultative reinsurance certificate describing Transco as RCA's 'Underwriting Managers' used by Transco in issuing the RCA Certificates" (O'Shaughnessy's affidavit, par. 4). While this creates a dispute on this fact, the dispute is not material because, even if the forms were never approved, the lack of approval was not communicated to American Centennial.

1983); *Schoenberger*, 84 Ill.App.3d at 1138–9, 39 Ill.Dec. 941, 405 N.E.2d 1076. American Centennial claims that RCA ratified the certificates by accepting premiums on them for almost six years. RCA claims that it did not because it did not know of Transco's (and American Centennial's) alleged fraud in saddling it with a known claim by backdating. American Centennial correctly points out that the critical knowledge here is not of the alleged fraud but of the terms of the certificate. It claims that RCA received a copy of the certificate covering Alaska (RPC No. 21003) and yet retained the premiums paid on this certificate, and also paid claims based on the certificate. RCA does not dispute this fact. While the record is silent on whether RCA ever saw a copy of the certificate covering PACCAR (RPC No. 21002) during the time it was accepting premiums, it is the same form containing the same arbitration clause. RCA is free to arbitrate its real dispute, that it was fraudulently induced to extend coverage over the Frazier claim, but it cannot reasonably dispute that it ratified a reinsurance relationship which provided for arbitration.

For the reasons stated, this court stays this lawsuit and orders arbitration.