**D.C. TAYLOR, CO., Plaintiff,**

v.

**DYNAMIT NOBEL OF AMERICA, INC., Halm Building Specialties of Iowa, Inc., a/k/a Joe Halm Building Supplies, and the American Arbitration Association, Defendants.**

**No. 81 C 1951.**

United States District Court, N.D. Illinois, E.D.

July 21, 1982.

---

Gary L. Prior and Roger W. Wenthe, McDermott, Will & Emery, Chicago, Ill., for plaintiff.

Keith C. McDole, Levy & Erens, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

The parties to this litigation are plaintiff D.C. Taylor Co. ("DCT") and defendants Dynamit Nobel of America ("DNA"), Halm Building Specialties of Iowa, Inc. ("Halm"), and the American Arbitration Association ("AAA"). DCT is an Iowa corporation in the business of installing roofs. DNA is a New Jersey corporation, doing business in the Northern District of Illinois, that manufactures polyvinylchloride (PVC) membrane roofing materials under the brand name "Trocal." Halm, an Illinois corporation, is DNA's exclusive Midwest distributor. From 1974 until 1978 or 1979, DCT was an authorized applicator of DNA's roofing materials.

DCT's Amended Complaint has eight counts. Counts I–III allege violations of the federal antitrust laws and Counts IV–VII allege pendent state law claims of retaliatory discharge, tortious interference with prospective business relationships, defamation, negligence and fraud. In Count VIII, DCT seeks to enjoin or stay arbitration of its disputes with DNA. This is the only count involving the AAA.

The matter is before the court on DNA's motion to stay these proceedings pending arbitration and DCT's motion to enjoin or stay arbitration. The motions raise two issues: whether there is a valid arbitration agreement between DCT and DNA; and, if so, whether the court should stay arbitration pending judicial resolution of the antitrust claims in Counts I–III under the permeation doctrine.

I. *Validity of the Arbitration Agreement*

DCT alleges that in mid-1978 it began offering a membrane roof system manufactured by a competitor of DNA, while continuing to offer DNA's product. DCT further alleges that in retaliation DNA terminated DCT as an authorized Trocal applicator. In March, 1979, the parties signed a "Termination Agreement" to wind-up their affairs in an orderly fashion. See Exhibit IX to the Amended Complaint.

Paragraph 19 of the Agreement states, in relevant part:

Any dispute or controversy arising out of the construction of, performance or breach of this agreement shall be determined by arbitration ... and any award rendered shall be enforceable in any competent court of jurisdiction.

In December, 1980, DNA filed a demand for arbitration pursuant to this paragraph, claiming that DCT, in violation of the agreement, failed to install Trocal roofing materials in a workmanlike manner and in compliance with DNA's standard practices and specifications. DNA listed 250 roof projects with alleged installation defects in a rider to its demand.

DCT filed an answer to this demand in which it contested the scope of the disputes subject to arbitration. DCT's position is that the Termination Agreement only applies to the 99 roofing jobs specifically listed as Exhibit A to the agreement and that the other 151 jobs submitted by DNA are not subject to arbitration. DCT's answer also raised a number of affirmative defenses to DNA's claims. It did not, however, challenge the validity of the Termination Agreement.

In February, 1981, DCT filed its own demand for arbitration, asserting five counterclaims "without waiver of the objections raised in [its] Answer." In April, 1981, DCT filed its original complaint in this action. As previously mentioned, Count VIII of the Amended Complaint challenges the validity of the arbitration agreement and seeks to enjoin the arbitration.

DCT argues that there is no valid arbitration agreement and therefore that arbitration should be enjoined.[1] DCT points to the Federal Arbitration Act, 9 U.S.C. §§ 1–14, which provides that a written arbitration provision "shall be valid, irrevocable, and enforceable, save upon such grounds as ex-

---

1. DCT concedes that if the arbitration agreement is found to be valid, then arbitration may not be enjoined, but it argues that it should be stayed under the permeation doctrine, see Part II, *infra*.

ist at law or in equity for the revocation of any contract," 9 U.S.C. § 2, and contends that the common law contract defenses of duress, unconscionability, mistake and fraud render this agreement invalid. DCT also demands an evidentiary hearing on these defenses pursuant to 9 U.S.C. § 4.[2] DNA counters that, accepting DCT's allegations as true for purposes of this motion, DCT has not alleged facts establishing its asserted defenses as a matter of law, and therefore that an evidentiary hearing is not required prior to denying the motion to enjoin arbitration.

■ While it is correct that the Federal Arbitration Act requires a federal court to resolve any issue involving the making of an arbitration agreement, the Supreme Court has made it clear that such an agreement is separable from any contract in which it may be contained. In *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.*, 388 U.S. 395, 402–04, 87 S.Ct. 1801, 1805–1806, 18 L.Ed.2d 1270 (1967), the issue before the Court was "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators." *Id.* at 402, 87 S.Ct. at 1805. The Court held:

> [I]f the claim is fraud in the inducement of the arbitration clause itself—an issue which goes to the "making" of the agreement to arbitrate—the federal court may proceed to adjudicate it. But the statutory language does not permit the federal court to consider claims of fraud in the inducement of the contract generally.

*Id.* at 403–04, 87 S.Ct. at 1806–1807. Where the contractual language of the arbitration agreement is broad enough to include a defense to the contract, such an issue must be submitted to arbitration.[3]

**2.** That statute reads in part:
> If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof.

**3.** The arbitration clause here is broad enough to include the validity of the Termination

With these principles in mind, the court turns to an examination of DCT's asserted defenses.

*Duress*

In its complaint and in its memorandum in opposition to defendants' motion to stay these proceedings, DCT alleged that it was coerced into signing the Termination Agreement by DNA's wrongful withholding of roof guarantees, which DCT needed in order to be paid by its customers. This argument speaks to the validity of the Termination Agreement generally and under the reasoning in *Prima Paint* may not be considered by this court as a defense to the arbitration agreement.

■ To circumvent this problem, in its later memorandum in support of its motion to stay arbitration, DCT argues that the inclusion of the arbitration clause was the result of "a separable duress," citing Paragraph 17 of the affidavit of DCT's counsel, Forrest Rosser. Accepting the assertions in the affidavit as true for purposes of this motion, DNA first brought up the subject of a general arbitration clause late at night after several hours of negotiation. Furthermore, DNA represented that if DCT would not accept the clause, DNA would not sign the agreement.

These allegations, however, do not constitute duress.

> To invalidate an agreement on the basis of duress, a party must show that he was induced by a wrongful act or threat of another to execute an agreement under circumstances which deprived him of his free will. Duress does not exist merely where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances.

*Higgins v. Brunswick Corp.*, 76 Ill.App.3d 273, 32 Ill.Dec. 134, 138, 395 N.E.2d 81, 85 (1st Dist.1979). Long hours of negotiating

Agreement, but, as noted above, based on DCT's answer to DNA's demand for arbitration and its own counterdemand, DCT has not raised any defenses to the validity of the Termination Agreement in the arbitration proceedings.

and a "take-it-or-leave-it" position amount to hard bargaining, not duress.[4]

### Unconscionability

Outside of conclusory allegations that the arbitration clause was unconscionable, DCT does not present any facts in support of its position. The argument is plainly without merit.

### Fraud or Mistake

DCT's basis for its contention that the arbitration agreement was the result of fraud or mistake is that during negotiations DNA allegedly represented that the arbitration clause would only cover the 99 specific projects listed in Exhibit A to the Termination Agreement. Because DNA has submitted 250 projects to arbitration, DCT argues either that both DNA and DCT were misinformed as to the scope of the clause, in which case the clause should be rescinded for mutual mistake, or else that DNA misrepresented the scope of the clause to DCT, in which case it should be rescinded for fraud. Whether the arbitration clause covers all 250 projects or only the 99 is properly decided by the arbitrator because it involves the scope of arbitration, and that decision will necessarily resolve, one way or another DCT's allegation of fraud or mistake.[5]

DCT, however, asserts that the court and not the arbitrator must determine whether an issue is subject to arbitration and therefore that this court must determine whether the parties actually agreed to exclude from arbitration all projects except the 99 listed in Exhibit A to the Agreement. But a court's power to determine whether an issue is subject to arbitration is no more than the power to determine "whether the party seeking arbitration is making a claim which on its face is one governed by the agreement." *United Steelworkers of America v. American Manufacturing Co.,* 363 U.S. 564, 568, 80 S.Ct. 1343, 1346, 4 L.Ed.2d 1403 (1960). Accord, *National Railroad Passenger Corp. v. Chesapeake & Ohio Railway Co.,* 551 F.2d 136, 140 (7th Cir. 1977); *Galt v. Libbey-Owens-Ford Glass Co.,* 376 F.2d 711, 714 (7th Cir.1967).

The arbitration clause in this case encompasses any dispute arising out of the construction, performance or breach of the Termination Agreement. And an examination of the Agreement reveals that it applies to more projects than just the 99 listed. For example, while Paragraphs 1 and 2 of the Agreement are limited to those projects listed in Exhibit A without any prefix, and Paragraph 3 applies to those listed with a prefix Z, Paragraph 4 includes "all Trocal projects installed or to be completed by DCT." Arguably then DNA may challenge DCT's performance on any project under the arbitration clause of the Agreement. This is the extent to which this court may inquire, and having determined that DNA's claim falls within the ambit of the arbitration clause "on its face," this court must allow the arbitrators to determine whether the parties' agreement in fact included the disputed projects.

Accordingly, the court concludes that even under plaintiff's view of the facts there is a valid arbitration agreement.[6] In such case, the Federal Arbitration Act, 9 U.S.C. § 3, requires a federal court to stay proceedings upon any issue referable to arbitration under the agreement, so long as the party seeking arbitration is not in default.[7] The proceedings in federal court must be stayed pending arbitration even though the federal suit includes both arbitrable and nonarbitrable issues. See *Dic-*

---

4. DCT argues that DNA's withholding of the guarantees was wrongful and that this tainted the arbitration clause. Again, the withholding of the guarantees pertains to the Termination Agreement generally.

5. *E.g.,* if the arbitrator finds that the parties agreed to exclude all but the 99 projects listed, then DCT's argument is moot.

6. Thus, no hearing is required. *Cf. Janmort Leasing, Inc. v. Econo-Car International, Inc.,* 475 F.Supp. 1282, 1289–90 (E.D.N.Y.1979) (trial plainly not required in every case).

7. DCT has not alleged that DNA was in default.

kinson v. Heinold Securities Inc., 661 F.2d 638, 644–45 (7th Cir.1981); and C. Itoh & Co. v. Jordan International Co., 552 F.2d 1228, 1231–32 (7th Cir.1977).

In Itoh, the federal lawsuit involved a shipment of steel coils that Itoh purchased from Jordan and resold to a third party, Riverview Steel. The third party contended that the coils were defective and refused payment. Itoh brought suit against both Riverview and Jordan. Jordan then filed a motion to stay the proceedings under 9 U.S.C. § 3, alleging that the sales contract between it and Itoh contained an arbitration clause. The district court denied the motion on the grounds that arbitration could not resolve all the issues among the parties because, pursuant to the contract between Itoh and Riverview, the issue of whether the coils were defective was expressly excluded from arbitration. In the interests of judicial economy, the district court determined that the entire case should be resolved in one forum.

The Seventh Circuit reversed on this point. The Court reasoned that considerations of judicial economy had no place in determining whether to grant a stay of proceedings pending arbitration and that if the statutory prerequisites were met, the issuance of the stay was mandatory not discretionary. Accordingly, the Court held that:

> [I]f Jordan was otherwise entitled to a stay pending arbitration of its dispute with Itoh under Section 3 of the Federal Arbitration Act, it was error to deny its application on the ground that the controversy between Itoh and Riverview [was nonarbitrable].

552 F.2d at 1231–32. Similarly, here DNA is entitled to a stay pending arbitration even though the entire lawsuit may not be arbitrable.

There is, however, one judicially created exception to the above proposition, and that is the principle referred to as the permeation doctrine.[8]

---

**8.** The permeation doctrine did not come into play in the Itoh decision because that case did not involve non-arbitrable *federal* issues, and

## II. Permeation Doctrine

The permeation doctrine permits a federal court to stay arbitration in order to preserve its exclusive jurisdiction over non-arbitrable federal claims, such as federal antitrust claims. In this circuit, the two leading cases on the subject are Applied Digital Technology, Inc. v. Continental Casualty Co., 576 F.2d 116 (7th Cir.1978); and Dickinson v. Heinold Securities, Inc., 661 F.2d 638 (7th Cir.1981).

In Applied Digital, as in the present case, the complaint included both arbitrable state law claims and non-arbitrable federal antitrust claims. The district court had stayed arbitration pending resolution of the antitrust issues and the defendant, the party seeking arbitration, had appealed. The Seventh Circuit found that the permeation doctrine controlled the case and defined the doctrine as stating "if the antitrust issues permeate the entire case, the district court should proceed on the antitrust issues before the case is submitted to an arbitrator." 576 F.2d at 117. The Applied Digital Court noted that permeation is "a somewhat elusive concept" but articulated the following standard:

> Most courts have found permeation if an arbitrator could not easily separate the antitrust issues from the other arbitrable issues and could not easily decide the arbitrable issues without inquiry into the antitrust issues.

Id. at 118.

In Dickinson, the Court elaborated on the doctrine:

> Where the non-arbitrable issues substantially permeate the entire case and make it difficult to separate out the arbitrable issues, the district court has discretion to *stay* arbitration pending a judicial resolution of the non-arbitrable claims. By controlling the order of the two adjudications, a procedure within the power of the district court, the district court can pre-

---

as explained in the next section, the doctrine only applies to such issues.

serve its full authority to decide the non-arbitrable federal issues without any collateral estoppel consequences from a prior arbitration.

661 F.2d at 644, (emphasis in original). The *Dickinson* Court emphasized two limitations on the permeation doctrine. First, the doctrine has no applicability to non-arbitrable state law claims that may be intertwined with arbitrable issues because there is no federal interest inherent in adjudicating such claims in a federal forum. 661 F.2d at 643 n. 11. And secondly, even where the doctrine applies, it does not justify subjecting the arbitrable issues to judicial decision. The doctrine merely permits the district court to stay arbitration until the non-arbitrable federal claim has been resolved.[9]

The question presented here is whether the antitrust claims alleged in DCT's complaint permeate the issues submitted for arbitration, or vice versa, to such an extent that the resolution of the arbitrable issues would invade upon this court's sole right to decide the ultimate issues in the antitrust claims.[10] To answer this necessitates a careful scrutiny of the substance of the antitrust claims, the arbitrable issues, and the other facts surrounding the parties' dispute.[11]

As noted above, Counts I–III of the Amended Complaint allege violations of the federal antitrust laws. In Count I, DCT challenges DNA's alleged restrictive territorial and exclusive dealing policies as restraints on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. DCT also contends that after it began offering its customers another PVC roofing product, DNA and Halm retaliated against it, to compel DCT to cease doing business with the competitor, to punish it for having done so and to enforce the restrictive marketing policies. This retaliation allegedly took the form of interference with prospective customers, wrongful withholding of roof guarantees, and disparagement of DCT's work through "ostentatious" inspections and blaming roof defects on DCT's workmanship when the cause lay with DNA. The retaliation allegedly culminated in DCT's termination, which DCT asserts constituted a concerted refusal to deal or group boycott in violation of the Sherman Act.

In Count II, DCT alleges that DNA's exclusive dealing policy violated Section 3 of the Clayton Act, 15 U.S.C. § 14. And in Count III, DCT alleges that DNA occupied until at least 1977 a monopoly position in the manufacture and sale of PVC roof membranes and that DNA and Halm have sought to maintain and abuse this monopoly position by means of restrictive marketing policies. DCT further asserts that DNA and Halm attempted to compel DCT to refrain from doing business with competitors and to punish it for having done so, by interfering with prospective customers, wrongfully withholding guarantees, and maligning DCT's workmanship. DCT concludes that this constituted attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

Turning now to the issues submitted for arbitration, DNA's demand presents a single discrete issue: whether DCT installed the roofing materials in a workmanlike manner and according to DNA's standard practices and specifications.[12] DCT's answer raises six affirmative defenses to DNA's claim:

**9.** The *Dickinson* court thus drew a distinction between the permeation doctrine, which only allows a court to stay arbitration and the Fifth Circuit's "doctrine of intertwining" under which a court could deny arbitration. The Court rejected the latter doctrine.

**10.** Any overlap between the arbitrable issues and DCT's state law claims is, of course, irrelevant for purposes of the permeation doctrine, whether or not the state law claims are themselves subject to arbitration.

**11.** "Resolution of this controversy requires that we look in some detail at the contract, its alleged breach and other surrounding alleged facts." *Applied Digital,* 576 F.2d at 117.

**12.** The court offers no opinion as to whether the arbitration agreement encompasses all 250 projects. The arbitrator properly determines the scope of the arbitration agreement. See pp. 878–879, *supra.*

1) that DCT's liability on any roofing installation is limited to two years and any claim based on a roof installed more than two years ago is beyond its liability;

2) that DCT substantially complied with DNA's specifications in all roof installations;

3) that the proximate cause of any roof failure was a defect in the Trocal roofing material;

4) that DNA's specifications, purportedly designed to prevent any chemical reaction between coal tar pitch in a subroof and the PVC membrane, were inadequate to prevent such chemical reaction;

5) that DNA failed to make the inspections required under the Termination Agreement; and

6) that DNA failed to warn DCT of the propensity of the Trocal roof membranes to develop leaks as a result of shrinkage and exposure to the sun.

■ The court has gone in some detail into DCT's antitrust claims and the issues submitted to arbitration through DNA's demand [13] in order to show that there is no significant overlap between the two. The antitrust claims challenge DNA's marketing policies, while the issues raised by DNA's arbitration demand and DCT's answer are limited, for the most part, to the technical question whether the Trocal roof failures were due to DCT's defective installation or to DNA's defective product and specifications. Resolution of this question in arbitration could only have a collateral estoppel effect on DCT's assertion that DNA sought to punish it for dealing with a competitor by blaming roof defects on DCT's workmanship. Clearly, this is not a crucial aspect of DCT's case; even if the arbitrator ruled against DCT, this would not foreclose its antitrust claim. The issue of which party is responsible for any defective roofs is not an "ultimate issue" in the antitrust claims. The court concludes that there is no substantial permeation between DCT's antitrust claims and the issues raised by DNA's demand and DCT's answer. Therefore, the court cannot stay arbitration on DNA's demand.

■ DCT's counterdemand must now be considered. The court elects to treat DCT's counterdemand separately from DNA's original demand in order to discourage parties from attempting to circumvent the federal policy favoring arbitration by themselves creating a permeation problem. It would be an abuse of the permeation doctrine to allow the antitrust plaintiff to inject new issues into the arbitration proceedings and then to turn around and argue that all arbitration must be stayed because those issues overlap the antitrust issues. Therefore, even if the issues which DCT raised for the first time in its counterdemand permeated the antitrust issues, the court would be unwilling to stay arbitration solely on that basis. The issues in DCT's counterdemand, however, are not significantly intertwined with the antitrust issues.

DCT's counterdemand makes five claims.[14]

1) DCT alleges that DNA breached the Termination Agreement of March, 1979, by wrongfully withholding guarantees.[15]

2) DCT seeks to recover the cost of defending against claims relating to any installations not covered by the Termination Agreement.

**13.** The issues that DCT submitted to arbitration in its counterdemand will be dealt with separately.

**14.** The following analysis is not meant to indicate any opinion as to whether any of these claims are within the scope of the parties' arbitration agreement. Again, that question is properly resolved by the arbitrator.

**15.** The claim that DNA breached the Termination Agreement by continuing to withhold guarantees is distinct from the claim that DNA coerced DCT into signing the Agreement by withholding guarantees. Although DNA's alleged conduct is the same in both claims, one is for the period after March, 1979, and the other is for the period before that date. The latter claim, that DNA coerced DCT into the Agreement by withholding guarantees, has not been submitted to arbitration. See n. 18.

3) DCT alleges fraudulent representations by DNA regarding Trocal.

4) DCT alleges tortious interference with contractual relationships and intentional disparagement of its reputation.

5) DCT claims liquidated damages due to DNA's allegedly delivering the wrong materials for a specific installation.

Initially, the court notes that claims 2 and 5 pose no permeation problems because they are totally unrelated to the allegations in the antitrust counts. Claims 1, 3, and 4 arguably involve some permeation, but only with respect to DCT's claim of retaliation, which the court has already determined is collateral to DCT's primary antitrust claim.[16]

The court finds that even considering DCT's counterdemand along with DNA's demand there is an insufficient overlap with the antitrust claims to justify a stay of arbitration. The issues in the two proceedings, arbitration and the present suit, are dissimilar enough that the arbitrator could avoid deciding the ultimate antitrust issues.[17] The arbitration issues primarily involve the question whether DCT or DNA is at fault for any problems with the Trocal roofs. These issues can be separated from the antitrust issues, which primarily involve events and conduct preceding the execution of the Termination Agreement, such as DNA's allegedly restrictive marketing policies and attempted monopolization of the PVC roof market and its termination of DCT.

In summary, the court concludes that, as revealed by the pleadings in this case and in the arbitration proceedings, any overlap be-tween the antitrust issues and the arbitration claims is too insignificant to constitute permeation or to justify a stay of arbitration. Accordingly, the court denies DCT's motion to stay arbitration, and grants DNA's motion to stay these proceedings pending arbitration, on the condition that arbitration is limited to those claims raised in the demand, answer and counterdemand and that it excludes the ultimate antitrust issues raised in DCT's complaint.[18]

16. Furthermore, the issues involving withholding of guarantees and tortious interference are in arbitration because DCT put them there. If DCT truly does not want these issues decided by arbitration, it may seek to withdraw them from that forum.

17. Thus, the test for permeation set forth in *Applied Digital,* 576 F.2d at 118, has not been met in this case.

18. Both parties have argued in this court that the issue whether DNA's termination of DCT was wrongful has been raised in both fora. As the court interprets the arbitration pleadings, however, that issue has not been submitted to that forum. Furthermore, the court concludes that its submission at this time would be inappropriate because it could involve ultimate antitrust issues, e.g., whether DNA held a monopoly position and what was its intent in terminating DCT. The court is also of the opinion that the issue whether DNA coerced DCT to agree to the Termination Agreement, although normally an arbitrable issue, would similarly raise permeation problems, but again that issue has not been raised in the arbitration proceedings. See pp. 877–878, *supra.*