McMillan v. Unique Places, LLC, 2015 NCBC 4.

STATE OF NORTH CAROLINA

CATAWBA COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 2179

GEORGE "ERIK" McMILLAN, ENIGMA
UNIVERSAL TECHNOLOGIES, LLC
d/b/a ENIGMA LED, and KISA
McMILLAN,

        Plaintiffs,

v.

UNIQUE PLACES, LLC, JOSH HAWN,
JEFFREY SCOTT, JEFF FISHER, UP
PROPERTY 1, LLC, ANN SHY, and
WARREN HENRY HUNTSMAN,

        Defendants.

**AMENDED ORDER AND OPINION**

{1}   **THIS MATTER** is before the Court upon Defendants Unique Places, LLC ("Unique Places"), Josh Hawn, Jeffrey Scott, Jeff Fisher, and UP Property 1, LLC's ("UP Property 1") (collectively, "Defendants") Motions to Stay Proceedings and Compel Arbitration (the "Arbitration Motions") and Defendant Josh Hawn's Motion for Appointment of a Receiver (the "Motion for a Receiver") in the above-captioned case.

{2}   The Court, having considered the Motions, affidavits, and briefs in support of and in opposition to the Motions, as well as the arguments of counsel at the December 17, 2014 hearing in this matter, hereby **GRANTS** the Arbitration Motions and **DENIES** the Motion for a Receiver without prejudice to Defendant Hawn's right to seek such relief in any arbitration proceedings between these parties for the reasons stated below.

*Law Offices of Matthew K. Rogers, PLLC, by Matthew K. Rogers, for Plaintiffs.*

*Patrick, Harper & Dixon, LLP, by Michael J. Barnett, and Forrest Firm, P.C., by Michael R. Epperly, for Defendants Unique Places, LLC, Josh Hawn, Jeffrey Scott, Jeff Fisher, and UP Property 1, LLC.*

*York Williams, LLP, by Gregory C. York, for Defendants Unique Places, LLC, Jeffrey Scott, Jeff Fisher, and UP Property 1, LLC.*

*Brooks, Pierce, McClendon, Humphrey & Leonard, LLP, by Clint S. Morse, for Defendant Josh Hawn.*

Bledsoe, Judge.

## I.

## BACKGROUND

{3} Plaintiff George "Erik" McMillan has invented and patented several types of LED lights and high efficiency improvements to LED lights. He and his wife, Plaintiff Kisa McMillan (together, the "McMillans"), founded the predecessor to Plaintiff Enigma Universal Technologies, LLC d/b/a Enigma LED ("Enigma"), in order to manufacture LED lights and to foster, develop, and monetize Erik McMillan's research and associated inventions. The McMillans subsequently sought investors to provide both capital and "sweat equity" to further the growth of their business.

{4} In early 2013, Defendants Hawn, Scott, and Fisher indicated their interest in investing in the McMillans' business. Fisher manages Defendants Unique Places and UP Property 1.

{5} On May 6, 2013, the McMillans and Defendants Hawn, Scott, and Fisher executed a Memorandum of Understanding ("MoU"), a three-page document describing the basic parameters of the parties' agreement. The MoU contemplated the formation of a new entity, Enigma, which would

continue the McMillans' business and which would be owned 35% by Erik McMillan, 27.5% by Hawn, 27.5% by Fisher, and 4% by Scott. The MoU also contemplated that Fisher would make an initial capital contribution to Enigma of approximately $75,000, which was intended to cover the McMillans' salaries, and that Fisher and Hawn would, among other things, obtain and personally guarantee a line of credit for Enigma. Scott agreed to work at Enigma one day each week in exchange for his equity interest.

{6} On or about May 30, 2013, Hawn provided Erik McMillan with a draft version of Enigma's Operating Agreement (the "Original Agreement"). Spanning more than thirty pages, the Original Agreement, which reflected most of the material terms of the MoU and included a merger clause, set forth a more detailed and sophisticated embodiment of the parties' agreement than that delineated in the three-page MoU. Plaintiffs aver that either Hawn or Fisher drafted the Original Agreement. Erik McMillan informed Hawn that he was unable to understand many of the terms included in the Original Agreement, but that he would rely on Hawn and Fisher to ensure that the Original Agreement was consistent with the MoU. Fisher responded, according to Plaintiffs, that the Original Agreement did not alter or override the MoU, but instead "complemented" and "supplemented" the MoU. (Am. Compl. ¶ 86.) Heeding Fisher's advice, Plaintiffs retained Defendant Ann Shy, an attorney, to assist with their review and understanding of the Original Agreement.

{7}     On June 21, 2013, Fisher presented a finalized version of the Original Agreement to Erik McMillan for his signature.  Erik McMillan indicated that he was working and did not have time to read the Original Agreement, but that he would sign it so long as it reflected the terms of the MoU.  Fisher purportedly responded that the Original Agreement and the MoU were "tied hand in hand" and that the Original Agreement was essentially an "add on" to the MoU.  (Am. Compl. ¶ 92.)  Erik McMillan signed the Original Agreement without reading it.

{8}     Page 34 of the Original Agreement includes the following provision, which was not included in the MoU:

> 7.4     Governing Law; Arbitration. . . .  Any dispute arising out of or in connection with this Agreement or the breach thereof shall be decided by arbitration to be conducted in Durham, North Carolina in accordance with the then prevailing commercial arbitration rules of the American Arbitration Association.  All determinations made in any such arbitration proceeding shall be final and conclusive on all parties, and judgment incorporating such determinations may be entered in any court of competent jurisdiction. . . .

(Orig. Ag. § 7.4, p. 34.)

{9}     The parties subsequently executed an Amended and Restated Operating Agreement for Enigma (the "Amended Agreement").[1]  Provision 13.4 on page 31 of the Amended Agreement sets forth the same language included in provision 7.4 of the Original Agreement, *supra*.  Erik McMillan asserts that he did not read the Amended Agreement and was unaware of its

---

[1] The purpose of the Amended Agreement was to address tax issues not pertinent to the Court's resolution of the present Motions.

arbitration clause at the time he signed it. Plaintiffs contest the validity of both the Original Agreement and the Amended Agreement (collectively, the "Agreements").

{10} Thereafter, discord ensued among the parties concerning control over Enigma and its operations, prompting Plaintiffs to file the present lawsuit on September 3, 2014. This action was designated a complex business case and assigned to the undersigned that same day.

{11} On September 8, 2014, Defendants filed the present Motions, requesting that Plaintiffs' claims be resolved in arbitration in accordance with the Agreements.[2]

{12} On October 3, 2014, Plaintiffs filed an Amended Complaint, supported by thirty-four (34) exhibits, in addition to Plaintiffs' response in opposition to the Motions.

{13} The Court held a hearing on the Motions on December 17, 2014. The Motions are now ripe for resolution.

II.

ANALYSIS

{14} North Carolina courts apply the following standard in determining whether a dispute is properly subject to arbitration:

> As a general matter, public policy favors arbitration. However, before a dispute can be ordered resolved through arbitration, there must be a valid agreement to arbitrate. Thus, whether a dispute is subject to arbitration is a matter of contract law. Parties to an arbitration must specify clearly the scope and

---

[2] Defendants filed two separate Motions seeking to compel arbitration with respect to the claims asserted by (i) Erik McMillan and Enigma; and (ii) Kisa McMillan.

terms of their agreement to arbitrate. Moreover, a party cannot be forced to submit to arbitration of any dispute unless he has agreed to do so.

The question of whether a dispute is subject to arbitration is an issue for judicial determination. . . . The determination of whether a dispute is subject to arbitration involves a two pronged analysis; the court must ascertain both (1) whether the parties had a valid agreement to arbitrate, and also (2) whether the specific dispute falls within the substantive scope of that agreement.

*Raspet v. Buck*, 147 N.C. App. 133, 135—36, 554 S.E.2d 676, 678 (2001)

(citations and quotation marks omitted).

<u>Existence of a Valid Agreement to Arbitrate</u>

i. Erik McMillan

{15} Plaintiffs contend that Erik McMillan is not bound by a valid agreement to arbitrate. Plaintiffs concede that Erik McMillan signed the Agreements, but assert that he was "fraudulently induced" to sign them and that he did not specifically agree to the arbitration clauses "buried therein." (Pls.' Br. Opp. Defs.' Mot. to Stay, p. 1.)

{16} The Court finds these contentions unpersuasive because under well-established North Carolina law, a signatory to "a written instrument is under a duty to read it for his own protection[;] . . . [is] ordinarily . . . charged with knowledge of its contents[;] . . . [and] may [not] predicate an action for fraud on his ignorance of the legal effect of its terms." *Raper v. Oliver House, LLC*, 180 N.C. App. 414, 420, 637 S.E.2d 551, 555 (2006) (quoting *Biesecker v. Biesecker*, 62 N.C. App. 282, 285, 302 S.E.2d 826, 828—29 (1983)); *see also*

*Leonard v. Power Co.*, 155 N.C. 10, 14, 70 S.E. 1061, 1063 (1911) ("[T]he law will not relieve one who can read and write from liability upon a written contract, upon the ground that he did not understand the purport of the writing, or that he has made an improvident contract, when he could inform himself and has not done so."). Further, Erik McMillan had the opportunity to read the Agreements, but declined to do so, relying instead on Hawn and Fisher to include the appropriate terms.[3] *See Setzer v. Ins. Co.*, 257 N.C. 396, 401, 126 S.E.2d 135, 139 (1962) ("[W]here no trick or device had prevented a person from reading the paper which he has signed or has accepted as the contract prepared by the other party, his failure to read when he had the opportunity to do so will bar his right to reformation.").[4]

{17} Plaintiffs also seek to invalidate the Agreements on grounds that they were unsupported by consideration. Plaintiffs contend, in this respect, that Defendants failed to provide any consideration to support the Agreements beyond what Defendants had already promised under the MoU. This contention lacks merit, however, as the Agreements include numerous provisions that were not included in the MoU but that function to protect the McMillans' interest in their business. The Agreements' non-compete and

---

[3] The attorneys' fees provisions of the Agreements – provision 7.13 on page 35 of the Original Agreement and provision 13.13 on page 32 of the Amended Agreement – reference the Agreements' arbitration clauses as well.

[4] Plaintiffs' allegations that Defendant Shy failed to disclose certain conflicts of interest with other clients are irrelevant for purposes of the present Motions.

nondisclosure provisions[5], for instance, guard against Defendants' misappropriation of Enigma's proprietary information and preclude Defendants from competing with Enigma for two years after leaving the company, should they seek to do so. These protections appear especially significant to Erik McMillan in light of his contributions to Enigma – two patents and all intellectual property that he creates in the future – which comprise the foundation of Enigma's business.

{18} The Court has reviewed Plaintiffs' remaining contentions on this issue and finds them to be without merit. Accordingly, the Court concludes that the Agreements contain valid agreements to arbitrate and that Erik McMillan is bound by these provisions.

## ii. Kisa McMillan

{19} Plaintiffs further contend that Kisa McMillan is not bound by a valid agreement to arbitrate because she did not sign the Agreements.

{20} While it is generally true that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit, a variety of nonsignatories of arbitration agreements have been held to be bound by such agreements under ordinary common law contract and agency principles." *LSB Fin. Servs. v. Harrison*, 144 N.C. App. 542, 547, 548 S.E.2d 574, 578 (2001) (citations and quotation marks omitted). In *Harrison*, for example, the North Carolina Court of Appeals held that a non-signatory to an agreement was bound by the agreement's arbitration provision because "[i]t [was] clear from

---

[5] (Orig. Ag. §§ 1.7—1.10, p. 17—18; Am. Ag. §§ 7.7—7.10, p. 15.)

the text and purpose of [the agreement] that the parties to the agreement intended to benefit such nonsignatory, third parties . . . ." *Id.* In determining whether the contracting parties intended to benefit a third party, "the court 'should consider [the] circumstances surrounding the transaction as well as the actual language of the contract.'" *Revels v. Miss Am. Org.*, 182 N.C. App. 334, 336, 641 S.E.2d 721, 723 (2007) (citation omitted) (alteration in original).

{21} Here, the circumstances under which the parties executed the Agreement, in addition to the terms of the Agreements themselves, support a finding that Kisa McMillan was an intended third-party beneficiary of the Agreements. As Erik McMillan states in his affidavit, he and Kisa McMillan work "as a team" and he is "not sure if [he could] work anywhere without Kisa's help." (Erik McMillan Aff. ¶ 12, Oct. 3, 2014.) Seeking to monetize Erik McMillan's inventions, the McMillans, as a team, sought investors to further their business, eventually entering into the Agreements now at issue. Although Kisa McMillan did not sign the Agreements, the terms of the Agreements benefit both of the McMillans by requiring that Defendants provide equity and debt financing to further the business conceived by the McMillans years earlier.[6] While it is true that the MoU provided similar terms to benefit the McMillans, the MoU was superseded by the Agreements,

---

[6] Specifically, the Agreements require Fisher (through Unique Places) to provide a $75,000 capital contribution and further require Fisher (through Unique Places) and Hawn to obtain and guarantee loans on Enigma's behalf. The Agreements also require Scott to provide "sweat equity" in that he promised to dedicate at least one day of work each week to Enigma. That Defendants may have failed to fulfill some of these promises does not detract from the manifest intent of these provisions to benefit both Erik and Kisa McMillan.

each of which contains a merger clause indicating that it represents "the entire agreement among the parties relative to the subject matter hereof . . . ." (Orig. Ag. § 7.5, p. 34; Am. Ag. § 13.5, p. 31.)

{22} Moreover, Plaintiffs assert claims based on Kisa McMillan's status and rights that derive, if at all, from the Agreements. *See Holshouser v. Shaner Hotel Grp. Props., One Ltd. P'ship.*, 134 N.C. App. 391, 400, 518 S.E.2d 17, 25 (1999) ("A person is a direct beneficiary of the contract if the contracting parties intended to confer a legally enforceable benefit on that person."). Specifically, the Agreements designate Kisa McMillan as Enigma's "Director of Operations"[7] (Orig. Ag. § 5.1.3, p. 8; Am. Ag. § 5.1.3, p. 11.), and Plaintiffs use this fact to support their conversion claim, asserting that Defendants "lack[ed] authority to terminate" Kisa's employment with Enigma because "[a]fter Hawn resigned as President, Erik and Kisa were the highest ranking officers of Enigma . . . ." (Am. Compl. ¶ 423.); *see Am. Bankers Ins. Group v. Long*, 453 F.3d 623, 628 (4th Cir. 2006) (providing that "a nonsignatory should be estopped from denying that it is bound by an arbitration clause when its claims against the signatory 'arise[]from' the contract containing the arbitration clause" (citation omitted) (alteration in original)). Indeed, Plaintiffs themselves identify Kisa McMillan as a third party beneficiary to the Agreements, asserting in support of their breach of

---

[7] This designation of Kisa McMillan as Enigma's "Director of Operations" superseded the MoU's designation of Kisa McMillan as Enigma's "Operations Manager." (Am. Compl. Ex. 9, p. 1; Orig. Ag. § 7.5, p. 34; Am. Ag. § 13.5, p. 31.)

contract claim that although "Kisa was not a party to the Operating Agreements, [she] was . . . [an] intended beneficiary of the Operating Agreements." (Am. Compl. ¶ 450.)

{23} Accordingly, because Kisa McMillan was an intended third party beneficiary of the Agreements, and because Plaintiffs seek to assert rights based on Kisa McMillan's status as a third party beneficiary to the Agreements, the Court concludes that Kisa McMillan is also bound by the Agreements' arbitration provisions.

### iii. Enigma

{24} Although not specifically contested, the Court notes that Enigma is likewise bound by the Agreements' arbitration provisions. *See* N.C.G.S. § 57D-2-31(a) (2014) (providing that "[t]he LLC is deemed to be a party to the operating agreement and, therefore, is bound by and may enforce the provisions thereunder applicable to the LLC").

### Scope of the Arbitration Agreement

{25} Plaintiffs contend that even if they are bound by the Agreements' arbitration provisions, the scope of these provisions fails to encompass all of Plaintiffs' claims.

{26} In determining whether a plaintiff's claims fall within the scope of a particular arbitration provision, the Court "must look at the language in the agreement, *viz.*, the arbitration clause, and ascertain whether the claims fall within its scope. In so doing, any doubts concerning the scope of arbitrable

issues should be resolved in favor of arbitration." *Rodgers Builders, Inc. v. McQueen*, 76 N.C. App. 16, 23—24, 331 S.E.2d 726, 731 (1985) (citations and quotation marks omitted). "[W]hether a claim falls within the scope of an arbitration clause and is thus subject to arbitration depends not on the characterization of the claim as tort or contract, but on the relationship of the claim to the subject matter of the arbitration clause." *Id.* at 24, 331 S.E.2d at 731 (citations omitted).

{27} In *McQueen*, the North Carolina Court of Appeals addressed the scope of an arbitration clause which specified that "[a]ll claims . . . arising out of, or relating to, the Contract Documents or the breach thereof . . . shall be decided by arbitration . . . ." *Id.* at 18, 331 S.E.2d at 728. The court held that "the language of the arbitration clause [was] sufficiently broad to include *any* claims which [arose] out of or [were] related to the contract or its breach, regardless of the characterization of the claims as tort or contract." *Id.* at 25, 331 S.E.2d at 732. The court further held that the language of the arbitration clause encompassed the plaintiff's claims for fraud, unfair and deceptive trade practices, and negligent misrepresentation, as each claim "concern[ed] alleged tortious conduct on the part of defendants [that] occurred in connection with, or as a part of, the formation of, performance under, or breach of the contract between [the parties]." *Id.* at 25, 331 S.E.2d at 732.

{28} More recently, the United States District Court for the Eastern District of North Carolina considered the scope of an arbitration clause

"requir[ing] arbitration of '[a]ny [c]laim arising out of or related to the Agreement.'" *United States ex rel. TGK Enters. v. Clayco, Inc.*, 978 F. Supp. 2d 540, 549 (E.D.N.C. 2013). Noting that "[t]he Supreme Court and the Fourth Circuit have recognized that such language represents a 'broad' arbitration provision," the court determined that the "plaintiff's state law claims . . . squarely fall within the scope of the arbitration agreement." *Id.* (citing *Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 350 (4th Cir. 2001); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 398 (1967)).

{29} The arbitration clauses here, similar to those at issue in *McQueen* and *Clayco*, each provide that "[a]ny dispute arising out of or in connection with this Agreement or the breach thereof shall be decided by arbitration . . . ." (Orig. Ag. § 7.4, p. 34; Am. Ag. § 13.4, p. 31.) Upon review, the Court finds, as detailed below, that all of Plaintiffs' claims fall within the scope of this broad language, as each claim either "arises out of" or "in connection with" the Agreements.

{30} Initially, the Court notes that Plaintiffs' twelfth and thirteenth claims for relief allege that Defendants breached the Agreements themselves and thus plainly "arise out of" the Agreements. Likewise, Plaintiffs' claim that Defendants breached the MoU (eleventh claim for relief) "arises out of" the Agreements because many of the alleged breaches in support of this claim concern the same promises allegedly breached under the Agreements. For

example, paragraphs 448, 466, and 480 of Plaintiffs' Complaint allege breaches of the same ten (10) promises under the MoU, Original Agreement, and Amended Agreement, respectively.[8]  Additionally, Plaintiffs' breach of fiduciary duty claim (second claim for relief) alleges that Defendants breached duties owed to Plaintiffs by virtue of their relationship, as established under the Agreements.

{31}  Plaintiffs also assert a number of claims alleging conduct that implicates specific provisions of the Agreements and that, if proved true, would constitute breaches of those provisions.  Plaintiffs' misappropriation of trade secrets claim (sixth claim for relief) and conspiracy to defraud claim (ninth claim for relief) allege, *inter alia*, that Defendants misappropriated and conspired to misappropriate Enigma's trade secrets, conduct that is expressly prohibited under the Agreements.[9]  Plaintiffs' conversion claim (eighth claim for relief) alleges that Defendants converted Enigma's property to their own use, conduct that would violate the Agreements' general prohibition against use of Enigma property for "any personal benefit."  (Orig. Ag. § 4.3.2, p. 10; Am. Ag. § 4.3.2, p. 7.)  Plaintiffs' fourteenth claim for relief alleges that Defendants used other entities to compete with Enigma, conduct that would violate the Agreements' provision that, absent Enigma's consent, officers and managers of the company are prohibited from "engag[ing], directly or

---

[8] Moreover, the Agreements superseded the MoU, as noted above.

[9] (Orig. Ag. §§ 1.7—1.10, p. 17—18; Am. Ag. §§ 7.7—7.10, p. 15.)

indirectly, in activities that are competitive with [Enigma's] Business or that would constitute business opportunities of [Enigma]." (Orig. Ag. § 6.1, p. 11—12; Am. Ag. § 6.1, p. 9.) Finally, Plaintiffs' unfair and deceptive trade practices claim (fifteenth claim for relief) alleges that Hawn left Enigma to work for a competitor, raising a potential violation of the Agreements' non-compete provisions. *See McQueen*, 76 N.C. App. at 27, 331 S.E.2d at 733 (finding "no reason" to exclude UDTP claim from arbitration where "[t]he claim concern[ed] essentially a private dispute" and appeared asserted "merely to bolster and supplement the remainder of plaintiff's claims and to increase the amount of damages recoverable").

{32} Plaintiffs additionally allege claims that invoke certain rights or statuses that inhere in Plaintiffs, if at all, by virtue of the Agreements. Plaintiffs' intentional infliction of emotional distress claim (fifth claim for relief) alleges that Defendants intentionally caused the McMillans distress by terminating their employment with Enigma. The Agreements designate the McMillans' respective roles with Enigma, and any right to continued employment thus emanates from these roles or otherwise "arises out of" rights created under the Agreements. Similarly, Plaintiffs' obtaining property under false pretense claim (seventh claim for relief) asserts Plaintiffs' status as Enigma's "highest ranking officials" (Am. Compl. ¶ 423), and Plaintiffs predicate their dissolution claim (sixteenth claim for relief) upon Erik

McMillan's "rights as reflected in the [Agreements] as a minority Member of Enigma." (Am. Compl. ¶ 511.)[10]

{33} The Court further finds that Plaintiffs have asserted claims "in connection with" the Agreements. Plaintiffs' fraud claim (first claim for relief) alleges that Defendants fraudulently induced Erik McMillan to sign the Agreements, and Plaintiffs' tenth claim for relief alleges, in pertinent part, that Defendants "took advantage of the trust Erik placed in Hawn, Fisher and Shy with regard to explaining the purposes and effects of the [Agreements], and did not fully disclose the terms or effects of [the Agreements] to Erik." (Am. Compl. ¶ 443.)[11] Any such inducement or lack of disclosure occurred "in connection with" the formation of the Agreements. *See McQueen*, 76 N.C. App. at 18, 25, 331 S.E.2d at 728, 732 (finding that claims alleging misrepresentations in connection with formation of contract were within scope of contract's arbitration clause, which provided that "[a]ll claims . . . arising out of, or relating to, the Contract Documents or the breach thereof" were subject to arbitration). Moreover, Plaintiffs' libel and defamation claims (third and fourth claims for relief), which allege that Defendants informed Enigma's customers and suppliers that Erik and Kisa had "walked away" from Enigma (Am. Compl. ¶¶ 393—96), implicate the McMillans' roles with Enigma, as

[10] Furthermore, as discussed below, the Agreements set forth in detail the procedure to be employed by the parties in dissolving Enigma. (Orig. Ag. §§ 6.2—6.5, p. 31—32; Am. Ag. §§ 12.2—12.5, p. 28—29.)

[11] Although captioned "Breach of § N.C.G.S. 57D-3-04," which concerns inspection of company records, Plaintiffs' tenth claim for relief sets forth a variety of allegations, including those cited above.

delineated in the Agreements, and thus also concern a dispute "in connection with" the Agreements.[12]

{34} The Court concludes, accordingly, that the language set forth in the Agreements' arbitration provisions is sufficiently broad to encompass all of Plaintiffs' claims.

## Motion for a Receiver

{35} Defendant Hawn has moved the Court to appoint a receiver for Enigma, asserting that the company is "teetering on bankruptcy" and must be dissolved before it "loses all going concern value." (Hawn Mot. for Receiver, p. 1—2.) Hawn attributes Enigma's demise to the parties' "contentious" relationship, which, he alleges, has not only precluded effective management of Enigma, but also deterred potential investment in the company by third parties. (Hawn Mot. for Receiver, p. 3.)

{36} The Court does not disagree with Hawn's characterization of Enigma as a company in distress. As stated above, however, the Agreements prescribe the manner in which Enigma is to be dissolved should the parties seek to wind up the company. And because no other party to the Agreements joins Hawn in his request for a receiver, which seeks to deviate from the Agreements' dissolution provisions, a dispute exists among the parties concerning both whether and how Enigma should be dissolved. Accordingly, the Court finds that Hawn's Motion for a Receiver raises a dispute concerning subject matter

---

[12] Furthermore, each of Plaintiffs' claims for relief "incorporate[s] by reference as if fully set forth [therein] all prior allegations of the Complaint." (*E.g.*, Am. Compl. ¶ 385.)

that is governed by the Agreements and, therefore, is also subject to arbitration for the reasons stated above.

III.

CONCLUSION

{37} In light of the foregoing, the Court hereby (i) **GRANTS** Defendants' Motions to Stay Proceedings and Compel Arbitration and (ii) **DENIES** Hawn's Motion for Appointment of a Receiver without prejudice to Defendant Hawn's right to seek such relief in any arbitration proceedings between these parties.

{38} Accordingly, this civil action is hereby **STAYED** pending the outcome of any arbitration proceedings between the parties.

**SO ORDERED**, this the 14th day of January, 2015.