Rel: January 10, 2025

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of Southern Reporter. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in Southern Reporter.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2024-2025

_____

## SC-2024-0031

_____

## Digital Forensics Corporation, LLC

## v.

## King Machine, Inc., and Hartford Fire Insurance Company, as subrogee of Micron Precision, LLC, d/b/a King Machine, Inc.

### Appeal from Jefferson Circuit Court
### (CV-22-900222)

WISE, Justice.

Digital Forensics Corporation, LLC ("DFC"), appeals from the Jefferson Circuit Court's order denying its motion to compel arbitration.

Procedural History

On January 21, 2022, King Machine, Inc., and Hartford Fire Insurance Company, as subrogee of Micron Precision, LLC, d/b/a King Machine, Inc. ("the plaintiffs"), sued DFC in the Jefferson Circuit Court. In their complaint, the plaintiffs alleged that they had retained DFC to perform electronic-discovery services related to a discovery order entered in litigation in the Etowah Circuit Court. The factual allegations in the complaint included the following:

> "7. In the Fall of 2018, Plaintiffs began to discuss with Digital Forensics Corporation (hereinafter 'Defendant') the possibility of Defendant performing electronic discovery and digital forensics services for the Plaintiffs. In conducting an investigation as to the capabilities of the Defendant, the Plaintiffs examined the Defendant's website, where the Defendant holds itself out as a computer forensics and e-discovery expert. The website includes such statements and representations as: 'Where discovery meets evidence;' 'Quick turnaround times for data acquisition and extraction of cell phones, hard drives, and/or cloud-based accounts.'

> "8. The Defendant's website relating to litigation support states: 'Digital Forensics Corporation offers over of [sic] ten (10) years of experience in identifying, collecting and producing electronically stored information (ESI) in response to a legal request for production.' The website states that Digital Forensics Corporation is a qualified expert to perform court ordered forensic imaging, the preservation of data, cloud account extraction and the segregation of data. Potential customers are instructed that they will be able to: 'Go into court with compelling digital evidence.' The website also states: 'Customized acquisition process adheres to court ordered specifications.' It states that the Defendant is able to

provide: 'Consultation to identify potentially discoverable information.' It states: 'Extracted data provided in an easily sortable searchable format.'

"9. It also states: 'Digital Forensics Corporation specializes in identification and preservation of electronically stored information for use in both civil and criminal legal matters. E-discovery and ESI includes, but it is not limited to: Emails, documents, presentations, data bases, audio and video files, social media, websites and text messages.'

"10. It also states: 'Digital Forensics Corporation leads the industry due to a hands on approach using information technology using litigation support experience. Our combination of focused business and IT experience allows our Expert Engineers to provide cost-effective e-discovery and ESI solutions.'

"11. These are just some of the representations made by the Defendant that 'sets us [the Defendant] apart.' The website also describes the manner in which the Defendant presents data to customers: 'DFC provides extracted evidence in a format that can be easily searched and sorted, so attorneys can produce specific reports for presentations in court. Data can be provided on an external drive or via secured cloud-based portal.' This was a false statement. These statements were misrepresentations of Defendant's capabilities, including its capabilities in regard to the electronic discovery services.

"12. The misrepresentations were of material facts. Plaintiffs reasonably relied upon the misrepresentations in entering into the agreement with Defendant.

"13. Further conversations with the representatives of the Defendant included the same, similar and other representations that DFC was capable of delivering timely and efficient ESI e-discovery results. These representations

were also untrue. Therefore, the representations concerning the capabilities of the Defendant in regard to e-discovery and the production of documents and information through the e-discovery process that were made by Defendant's representatives were false and fraudulent.

"14. The Defendant's representatives never disclosed that they were incapable of performing for Plaintiffs as represented.

"15. The representations made by the Defendant were reasonably relied upon by Plaintiffs in engaging in further discussions with the Defendant regarding e-discovery services and ultimately retaining the Defendant as a vendor to assist the Plaintiffs in conducting electronic discovery in a case pending in the Circuit Court of Etowah County, Alabama styled R.C. Mold & Machine, Inc. and Quality Mold, Inc. v. Sean Sommers, Micron Precision, LLC and King Machine Americas, LLC (Civil Action No.: CV-17-900606) (hereinafter 'the R.C. Mold lawsuit').

"16. DFC also represents on its website that its employees include certified forensic computer examiners and repeatedly holds itself out as an expert in electronic discovery and capable of performing the work needed and contracted for Plaintiffs. These representations made by DFC on its website were reasonably relied upon by Plaintiffs. These representations also proved to be false.

"17. In addition, numerous DFC employees and representatives represented to Plaintiffs' attorneys that they could accomplish the mandates of the E-Discovery Order. These employees included, but were not necessarily limited to Robert Bixby (Agent 1219), Brent G. Walters (Analyst), Kenneth Probola (Customer Service Specialist), Mark Daniel (Sales Manager), and Chad Smith (Customer Service Manager). The representations made on DFC's website and by DFC's representatives were representations of material

fact that were relied upon by Plaintiffs in entering into an agreement with DFC and beginning work on e-discovery issues with DFC's assistance. The representations made verbally and in correspondence between Plaintiffs and DFC representatives and employees led Plaintiffs to retain DFC for e-discovery needs. Therefore, on December 12, 2018, a wire transfer in the amount of $9,992.00 was sent to DFC as an initial retainer."

The plaintiffs went on to allege:

"42. Ultimately, Plaintiffs continued to work with DFC, but DFC was not able to put the data and documents into a format that could be transferred, used and searched by opposing counsel as required by the ESI Discovery Order and the instructions contained therein, which, as noted, were sent to DFC on November 28, 2018, and were also attached to the questionnaire sent to DFC in January 2019. … They were also sent to Mr. Daniel in September 2019.

"43. While Plaintiffs were working with DFC to resolve the e-discovery issues and after DFC had received the initial retainer of $9,992.00, DFC continued to demand retainers to go forward with any work. Additional retainers in the amount of $15,000 was sent to DFC on February 13, 2019, and an additional retainer of $10,299.93 was sent to DFC on June 16, 2020, for an initial total of $35,291.93, to complete the e-discovery services.

"44. Ultimately in late February of 2020, the agreement with DFC for e-discovery services was changed to an agreement to transfer the saved data and documents to another vendor due to DFC's … breach of the agreement and inability to perform. Plaintiffs began using another e-discovery company to search and retrieve the data and documents and produce them to opposing counsel. Plaintiffs and the new vendor were able to recover the data from DFC. After having to 'start all over' in regard to the search process,

Plaintiffs were able to produce the documents in the proper format to opposing counsel by using the new vendor's services. This was only after Plaintiffs had already paid $35,291.93 to DFC for services that ended up being useless. In addition, Plaintiffs were forced to pay $15,000.00 in the R.C. Mold lawsuit in sanctions ordered by the Court due to DFC's inability to produce in a timely manner the documents in a proper format that could actually be produced to and used by opposing counsel as required by the Court's Order. Therefore, the total amount of actual monetary damages suffered by Plaintiffs totals $50,291.93, caused by the Defendant's breach of the agreement and Defendant's fraud. This amount does not include attorneys' fees and expenses.

"45. Digital Forensics not only breached the agreement, but it also misrepresented its abilities prior to entering into the contract with Plaintiffs. DFC fraudulently induced Plaintiffs into retaining DFC to perform services when it knew or should have known that it could not complete the services as required, as set forth in the questionnaire and the E-Discovery Order ….

"46. Defendant had a duty to notify Plaintiffs that it was incapable of performing the contract, but did not. Instead, it continued to conceal that fact and represent that it could perform.

"47. Digital Forensics Corporation caused Plaintiffs damages in the total sum of $50,291.93, which includes the amounts paid to Digital Forensics for the useless services, plus the $15,000.00 in sanctions ordered by the court.

"48. In addition, Plaintiffs had to pay its attorneys' fees and expenses to start all over again to complete the e-discovery document and data production with its new vendor, Epiq Systems, Inc. These additional and redundant attorneys' fees and expenses were incurred due to Defendant's breach of the agreement and its misrepresentations

6

concerning its abilities and its failure to disclose its inability to perform. These damages amount to $107,430.44. Therefore, Plaintiffs' total monetary damages total $157,722.37."

The complaint alleged claims of breach of contract and fraud in the inducement.

On March 10, 2022, DFC filed a notice of removal to the United States District Court for the Southern Division of the Northern District of Alabama ("the federal court"). On June 30, 2022, the federal court remanded the case back to the circuit court.

On July 15, 2022, DFC filed a "Renewed Motion to Dismiss and Compel Complaint Resolution Process or, Alternatively, Dismiss Pursuant to Forum-Selection Clause" ("DFC's motion to compel"). In that motion, DFC asked the circuit court to "dismiss the case and compel the Plaintiffs to submit to the Complaint Resolution Process outlined in their contract or, in the alternative, dismiss the case pursuant to the forum-selection clause set forth in the Jurisdiction provision of the contract." DFC asserted that it had "filed its initial motion to dismiss and compel complaint resolution process" in the federal court and that the federal court had not ruled on that motion before remanding the case back to the circuit court. DFC attached a copy of the "Service Authorization

Agreement & Acknowledgment" between it and King Machine ("the agreement") to its motion. The agreement included the following provision:

> "Complaint Resolution Process: Company [i.e., DFC] places a high value of importance on customer satisfaction and therefore treats every complaint with a commensurate degree of seriousness. For this reason, Company provides clear channels of communication for Client to convey any complaint or dissatisfaction with services rendered, with the goal of seeking a prompt and satisfactory resolution for both parties. In the event Client has a complaint or dispute with Company, Client agrees to communicate his/her grievance promptly to Company and allow Company a reasonable amount of time, as described below, to respond to Client's complaint and propose solutions. Client agrees to provide Company with a reasonable opportunity to cure any defect in service and every reasonable opportunity to resolve disputes in the following manner and follow all alternative dispute provisions:
>
>> "1) Initial Phase: In the event Client is not satisfied with services or is having billing issues, Client is instructed to contact customer service …. If the call goes to voicemail, Client must leave detailed message including case number and a brief description of the issue. Company will address stated customer issues within 3-6 business days.
>>
>> "2) Escalation Phase: In the event that customer service is unable to rectify customer issue, Client must email [DFC] providing detailed explanation of the issue. Once Client contacts Company management for escalation, a proposed resolution will be offered within 7 business days.

"3) If any of the above methods prove unsuccessful in resolving an issue, Client will then be entitled to have the complaint … reviewed by the President of the Company, to address Client's issue directly. Client will receive a resolution within 7-10 business days following communication with the President.

"4) If the Complaint remains unresolved or in the event the Company has a dispute with the Client pursuant to the terms of this Agreement, the Parties will submit the dispute to Mediation before an agreed upon Mediator which shall take place no later than 45 days after Client has received the communication with the President as stated above. If the Parties cannot agree upon a mediator, the Company shall present a list of at least five (5) competent mediators, with no ties to the Company, and the Client shall pick one person from that list to serve as Mediator.

"5) If mediation is unsuccessful, the dispute shall be submitted to binding arbitration pursuant to the commercial rules set by the American Arbitration Association. The Parties shall agree upon an arbitrator who shall be a retired judge from either a Common Pleas Court of the State of Ohio or a Federal District Court of the State of Ohio.

"6) In the event the Company believes Client's breach of this Agreement creates a risk of irreparable harm, the Company has the right to seek emergency injunctive relief before the Court of Common Pleas of Cuyahoga County or the Federal District Court for the Northern District of Ohio. Further, only in the limited scenarios of collection of unpaid fees and defamation claims,

> Company has the right to initiate a lawsuit outside of arbitration. CLIENT AGREES THAT THESE LIMITED EXCEPTIONS ARE FAIR."

(Capitalization in original; emphasis added.)

On August 24, 2022, the plaintiffs filed a "Motion for Order Compelling Mediation." On August 25, 2022, the plaintiffs filed their response to DFC's motion to compel. In their response, the plaintiffs argued, in part, that "the arbitration clause was fraudulently induced and is unenforceable." The factual allegations in the response regarding the alleged misrepresentations by DFC were substantially similar to those allegations included in the complaint and quoted above. In their response, the plaintiffs alleged that they had relied upon the various alleged misrepresentations about DFC's abilities in entering into the agreement that included the dispute-resolution and forum-selection provision quoted above. In their factual allegations, the plaintiffs asserted, in pertinent part:

> "The misrepresentations were of material facts. Plaintiffs reasonably relied upon the misrepresentations in entering into the dispute resolution and forum selection clauses in the agreement with [DFC]. … Based on the representations of [DFC's] expertise, it did not appear that these issues would arise or that the clauses would ever come into effect."

The plaintiffs went on to state, in pertinent part:

"As stated above, the Defendant made promises that it could not fulfill while making misrepresentations that it actually could fulfill those promises. The Defendant was never able to accomplish the tasks agreed to and as required by the Etowah County Court's Order, the contract and the description of work, and the discussions and promises made to the Plaintiff by the Defendant's representatives. There was fraud in the inducement to enter into the forum selection and dispute resolution provisions and continuing fraud thereafter in making the misrepresentations by DFC employees that DFC could perform a contract when it could not or did not intend to perform under the contract and the Defendant knew this."

The plaintiffs went on to assert:

"As noted above, the Plaintiff was fraudulently induced to agree to the dispute resolution process provision with the Defendant through fraud. 'One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.' Ala. Code § 6-5-104(a) (1975). Deceit means the suggestion of a fact which is not true by one who does not believe it to be true; the assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true; the suppression of a fact by one who was bound to disclose it or who gives information of other facts which are likely to mislead or prevent communication of that fact; or a promise made without any intention of performing it. Id. § 6-5-104(b). By inducing the Plaintiff to enter into the arbitration provision, the Defendant committed all of these acts of deceit. The Plaintiff relied upon these false representations or failure to disclose material facts in entering into the arbitration agreement and, therefore, the arbitration agreement is unenforceable. Jones[ v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 604 So. 2d 332 (Ala. 1991)]."

11

On September 21, 2022, the circuit court ordered the parties to mediation. On January 18, 2023, the mediator entered a report stating that the parties were unable to reach a settlement agreement in this matter.

On August 21, 2023, the circuit court entered an order denying DFC's motion to compel. DFC subsequently filed a motion to alter, amend, or vacate, which was denied by operation of law. This appeal followed. See Rule 4(d), Ala. R. App. P.

## Standard of Review

"'"This Court reviews de novo the denial of a motion to compel arbitration. Parkway Dodge, Inc. v. Yarbrough, 779 So. 2d 1205 (Ala. 2000). A motion to compel arbitration is analogous to a motion for a summary judgment. TranSouth Fin. Corp. v. Bell, 739 So. 2d 1110, 1114 (Ala. 1999). The party seeking to compel arbitration has the burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction affecting interstate commerce. Id. '[A]fter a motion to compel arbitration has been made and supported, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question.' Jim Burke Automotive, Inc. v. Beavers, 674 So. 2d 1260, 1265 n.1 (Ala. 1995)(opinion on application for rehearing)."'

"Elizabeth Homes, L.L.C. v. Gantt, 882 So. 2d 313, 315 (Ala. 2003) (quoting Fleetwood Enters., Inc. v. Bruno, 784 So. 2d 277, 280 (Ala. 2000))."

Hoover Gen. Contractors-Homewood, Inc. v. Key, 201 So. 3d 550, 552 (Ala. 2016).

## Discussion

DFC argues that the circuit court erroneously denied its motion to compel. It is undisputed that the agreement included an arbitration provision. Additionally, in their response to DFC's motion to compel, the plaintiffs did not dispute that the agreement "'"evidences a transaction affecting interstate commerce."'" Hoover Gen. Contractors-Homewood, Inc., 201 So. 3d at 552 (citations omitted). Rather, the plaintiffs challenged the validity and enforceability of the arbitration provision. Specifically, they argued that King Machine had been "fraudulently induced to agree to the dispute resolution process provision with [DFC] through fraud."

In this case, the plaintiffs have raised a claim of fraud in the inducement.

"It is well settled that claims of fraud in the inducement are, themselves, subject to arbitration, unless the alleged fraud directly involves the arbitration clause itself. Jones v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 604 So. 2d 332

(Ala. 1991); see also Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S. Ct. 1801, 18 L. Ed. 2d 1270 (1967).  In Jones, this Court explained:

> "'Since Prima Paint, it has become clear that in cases involving claims of fraud in the inducement of a contract affecting interstate commerce, the court must first determine whether the fraud claim is directed solely at the arbitration clause itself.  Coleman v. Prudential Bache Securities, Inc., 802 F.2d 1350, 1352 (11th Cir. 1986) (must be asserted that "arbitration clause itself, standing apart from the whole agreement, was induced by fraud"); Bhatia v. Johnston, 818 F.2d 418, 422 (5th Cir. 1987) (must be asserted that "arbitration clause alone, as opposed to the Customer Agreement generally," had been induced by fraud); see also Schacht v. Beacon Ins. Co., 742 F.2d 386, 390 (7th Cir. 1984).  If so, the party opposing arbitration is entitled to a trial involving state law issues relating to the making of the arbitration clause.'

> "604 So. 2d at 337 (emphasis in original).  However, in making this determination, the court is required to 'look[ ] beyond the ad hoc arguments of counsel' and to determine whether the 'claim of fraud actually bears upon the entire agreement and upon the activities of the parties in general.'  Id. (emphasis added)."

AmSouth Inv. Servs., Inc. v. Bhuta, 757 So. 2d 1120, 1123-24 (Ala. 2000).

In this case, the plaintiffs argued that DFC induced King Machine to execute the agreement to retain DFC, and the arbitration provision included therein, by misrepresenting its ability to perform the electronic-

14

discovery services in the manner required by the discovery order in the litigation in the Etowah Circuit Court. Thus, the plaintiffs' fraud-in-the-inducement claim is directed toward the agreement as a whole and not solely at the arbitration provision itself. Therefore, the plaintiffs' "allegations of fraud in the inducement do not provide a basis for avoiding arbitration." AmSouth, 757 So. 2d at 1124. Accordingly, the circuit court erred when it denied DFC's motion to compel.[1]

## Conclusion

_____

[1]In their brief to this Court, the plaintiffs argue, for the first time, that DFC waived arbitration by substantially invoking the litigation process by removing the case to federal court. The plaintiffs have not presented any authority to suggest that removing a case to federal court constitutes substantially invoking the litigation process and a waiver of arbitration. This Court has recently held: "[O]ur standard for considering waiver in the arbitration context now asks, '"'whether the party's actions as a whole have substantially invoked the litigation process.'"' Key [v. Warren Averett, LLC], 372 So. 3d [1132,] 1137 [(Ala. 2002)] (citations omitted)." CNU of Alabama, LLC v. Cox, [Ms. SC-2024-0060, Nov. 8, 2024] ___ So. 3d ___, ___ (Ala. 2024). The record before us indicates that DFC filed its notice of removal to the federal court on March 10, 2022. On March 17, 2022, DFC filed in the federal court a motion to dismiss and to compel the complaint-resolution process. The federal court remanded the case back to the circuit court on June 30, 2022, without ruling on the motion to dismiss and to compel. On July 15, 2022, DFC filed its renewed motion to compel in the circuit court. The plaintiffs have not established that DFC's actions, as a whole, substantially invoked the litigation process. Therefore, their argument that DFC waived arbitration is without merit.

For the above-stated reasons, we reverse the circuit court's order denying DFC's motion to compel. Accordingly, we remand this case to the circuit court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

Parker, C.J., and Sellers, Stewart, and Cook, JJ., concur.